IN THE SUPREME COURT OF THE STATE OF DELAWARE

KATHLEEN MCGUINESS,    §
   §    No. 438, 2022
   Defendant Below,    §
   Appellant,    §
   §    Court Below: Superior Court
   v.    §    of the State of Delaware (K)
   §
STATE OF DELAWARE,    §    Cr. ID No. 2206000799
   §
   Appellee.    §

Submitted: November 15, 2023
Decided:    February 13, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW** and **GRIFFITHS**, Justices; constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

Steven P. Wood, Esquire (*argued*), Chelsea A. Botsch, Esquire, McCARTER & ENGLISH, LLP, Wilmington, DE, Dean A. Elwell, Esquire, McCARTER & ENGLISH, LLP, Boston, MA, *Attorneys for Appellant Kathleen McGuiness*.

David C. McBride, Esquire (*argued*), M. Paige Valeski, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE, *Attorneys for Appellee State of Delaware*.

**LEGROW**, Justice, for the Majority:

An elected state official was indicted and tried on criminal charges arising from her conduct while in office. The parties vigorously litigated the case, and the trial court issued numerous well-reasoned and even-handed decisions before, during, and after the trial. The jury ultimately convicted the defendant of three charges while acquitting her of two others. She now appeals, arguing that "the trial that led to the convictions was profoundly unfair and unconstitutional."[1]

Notwithstanding the defendant's inflamed rhetoric, the record amply demonstrates that she received a fair trial. The defendant raises a mélange of issues on appeal, including that the State failed to present sufficient evidence of the charged crimes and violated the defendant's due process rights by suppressing exculpatory evidence. We reject those arguments because they distort the trial court's holdings or misapply the law. We conclude, however, that one of the defendant's convictions must be reversed because the legal insufficiency of one of the charges resulted in the spillover of evidence that prejudiced the jury's consideration of a closely linked charge. We therefore reverse the defendant's conviction for Official Misconduct. In all other respects, we affirm the trial court's decisions and the defendant's convictions.

---

[1] Video of Oral Argument, at 1:30–1:36 (Nov. 15, 2023).

# FACTUAL BACKGROUND

## A. The Investigation and The Indictment

Kathleen McGuiness was elected as the State of Delaware Auditor of Accounts in 2018 and was sworn into office in January 2019.[2] In April 2020, three Office of the Auditor of Accounts ("OAOA") employees who reported to McGuiness contacted the Delaware Department of Justice (the "DOJ") and alleged that she had engaged in misconduct.[3] These employees included the OAOA's fiscal manager, an outgoing administrative auditor, and a senior auditor.[4] The employees' chief complaints concerned office spending, McGuiness's engagement in political activity while working, and the misuse of no-bid contracts.[5] In addition to their concerns about McGuiness's misconduct, the employees expressed fear that they would face retaliation for their roles as whistleblowers.[6]

Several months later, McGuiness's Chief of Staff contacted the DOJ regarding his concern that McGuiness had awarded a state contract to a company called "My Campaign Group" ("MCG") for campaign work and that the contract became more

---

[2] App. to Opening Br. at A31 (Indictment).

[3] *Id*. at A4153–54 (Cousin Direct Exam.); A4244 (Haw-Young Direct Exam.); A4354–55 (Horsey Direct Exam.).

[4] *Id*. at A4416 (Robinson Direct Exam.).

[5] *Id*. at A4090–111 (Van Horn Direct Exam.).

[6] *Id*. at A4153–54 (Cousin Direct Exam.); A4244 (Haw-Young Direct Exam.); A4354–55 (Horsey Direct Exam.).

lucrative when MCG changed its name to "Innovate Consulting."[7] The Chief of Staff reported that McGuiness had directed him to pay an MCG invoice for $1,950 using his state-issued credit card because the invoice had been rejected by the Delaware Division of Accounting.[8]

Later, in October 2020, two more whistleblowers came forward—an administrative assistant and a human resources specialist—citing concerns that McGuiness's daughter ("Daughter") and Daughter's friend were on the state payroll while they were living and attending college out of state.[9] The Chief of Staff also questioned the propriety of Daughter's employment, suggesting that she did not do much work.[10]

Toward the end of 2020, McGuiness emailed the Delaware Department of Technology and Information ("DTI"), asking for the names of "anyone who had requested records for anyone in the auditors [sic] office since Jan 2019."[11] In the first few months of 2021, McGuinness placed one of the whistleblowers—the administrative auditor—on a performance improvement plan and fired her Chief of

---

[7] *Id*. at A3988–989 (Van Horn Direct Exam.).

[8] *Id*. at A3985–86 (Van Horn Direct Exam.); 4190–92 (Thomas Direct Exam.).

[9] *Id*. at A4423 (Robinson Direct Exam.); A4281–83 (Elder Direct Exam.); A4294–96 (Moreau Direct Exam.).

[10] *Id*. at A3991 (Van Horn Direct Exam.).

[11] *Id*. at A4427 (Robinson Direct Exam.).

Staff.[12]   The Chief of Staff later testified that, although McGuiness cited an inappropriate work relationship as the reason for his termination, that relationship ended months before he was fired.[13]

The DOJ began investigating the allegations against McGuiness in earnest in May 2021.[14]   First, an investigator from the DOJ's Division of Civil Rights and Public Trust (the "Division"), Franklin Robinson, contacted two OAOA casual-seasonal employees to determine whether Daughter and Daughter's friend were receiving benefits that other casual-seasonal employees were not.[15]   Both employees with whom Robinson spoke stated that they were paid less than Daughter and Daughter's friend and were not permitted to "bank" their hours as Daughter and Daughter's friend did.[16]   The process of "banking" hours allows employees to work extra hours during one pay period and apply those extra hours to a later pay period.[17]

The following month, Robinson called Daughter's friend to follow up on these reports.[18]   After the call ended, Robinson received a call from a blocked number,

---

[12] *Id*. at A4279–80 (Haw-Young Direct Exam.); A3977 (Van Horn Direct Exam.).

[13] *Id*. at A3973–75 (Van Horn Direct Exam.).

[14] *Id*. at A4464–65 (Robinson Direct Exam.).

[15] *Id*.

[16] *Id*. at A3314 (Vargas Direct Exam.).

[17] Answering Br. at 8.

[18] App. to Opening Br. at A3063 (Bateman Direct Exam.).

which he later determined belonged to McGuiness.[19]  Robinson also received a call from McGuiness's new Chief of Staff that same day.[20]   Later that summer, McGuiness's new Chief of Staff requested that DTI change Daughter's job title from "Public Information Officer" to "Intern," and McGuiness filed requests to monitor some of her current and former employees' emails and one of the whistleblowers' private messages.[21]

Robinson continued his investigation into the fall of 2021, conducting interviews with McGuiness's current Chief of Staff and Daughter.[22]   During her interview, Daughter told Robinson that McGuiness's former Chief of Staff initially interviewed her for the position, but she could not remember what questions she was asked.[23]   In response to inquiries about her limited email correspondence—which Robinson had obtained under a search warrant—Daughter told Robinson that she spent "essentially the whole day" on her email.[24]   Robinson's investigation also

---

[19] *Id.* at A4431–34 (Robinson Direct Exam.).

[20] *Id.* at A4430–34 (Robinson Direct Exam.).

[21]  Id. at A2921–22 (Herron Direct Exam.); A2975–76 (Herron Direct Exam.); A4445–46 (Robinson Direct Exam.).

[22] *Id.* at A4663 (Robinson Direct Exam.); A3795 (Ziamba Direct Exam.).

[23] *Id.* at A3796–97 (Ziamba Direct Exam.).

[24] *Id.*

revealed that Daughter's onboarding paperwork and payroll documents listed McGuiness as her supervisor.[25]

On September 28, 2021, the DOJ obtained a search warrant for the OAOA office, authorizing a search of:

> the books, papers, records and other documents of any officer, department, board, agency, instrumentality or commission of the state government. In this case, the places to be searched are the state offices of the Auditor of Accounts. Though the Attorney General may have right of access to state records and that the expectations of privacy may be diminished in state offices, your affiant believes probable cause nonetheless exists to show that the offices of the Auditor of Accounts reasonably contain evidence of the crimes described above.[26]

The following day, the DOJ executed the warrant and seized numerous laptops and computers from the OAOA office.[27] Following the seizure, on October 8, 2021, the DOJ obtained a warrant to search the digital devices' contents.[28] In an effort to ensure that investigators did not see McGuiness's privileged communications, the DOJ implemented a filter process for searching the OAOA devices. Under that process, the Delaware State Police High Tech Crimes Unit first searched the devices and provided those search results to a DOJ team, which would be uninvolved in McGuiness's prosecution (the "filter team"). The filter team reviewed all the

---

[25] *Id*. at A2694–95 (Sclesky Direct Exam); A3912-A3916 (Moore Direct Exam.).

[26] *Id*. at A720 (Office Search Warrant).

[27] App. to Answering Br. at B192 (DOJ Timeline).

[28] *Id*. at B189 (Digital Search Warrant).

6

material for privileged communications and then sent all non-privileged materials to the prosecution team.[29]

On October 11, 2021, a grand jury indicted McGuiness for five criminal charges relating to her conduct as the State's Auditor of Accounts. Count I charged McGuiness with Conflict of Interest in violation of 29 *Del. C.* § 5805.[30] The basis for Count I was McGuiness's role in hiring Daughter, acting as Daughter's supervisor, and giving Daughter a "position with advantages unavailable to other employees."[31]

Count II of the Indictment charged McGuiness with felony Theft in violation of 11 *Del. C.* § 841.[32] Daughter's employment also formed the basis of this count, and the State contended that McGuiness had taken, exercised control over, or

---

[29] Answering Br. at 12.

[30] App. to Opening Br. at A31 (Indictment). 29 *Del. C.* § 5805(a)(1) provides that "[n]o state employee, state officer or honorary state official may participate on behalf of the State in the review or disposition of any matter pending before the State in which the state employee, state officer or honorary state official has a personal or private interest, provided, that upon request from any person with official responsibility with respect to the matter, any such person who has such a personal or private interest may nevertheless respond to questions concerning any such matter. A personal or private interest in a matter is an interest which tends to impair a person's independence of judgment in the performance of the person's duties with respect to that matter."

[31] *Id*. at A35 (Indictment). Even Daughter's friend did not, according to the State, receive the same set of benefits as Daughter.

[32] *Id*. 11 *Del. C.* § 841 provides that "[a] person is guilty of theft when the person takes, exercises control over or obtains property of another person intending to deprive that person of it or appropriate it. Theft includes the acts described in this section, as well as those described in §§ 841A-846 of this title."

obtained property owned by the State of Delaware valued at more than $1,500 when she hired Daughter and gave her benefits not available to other employees.[33]

Count III charged McGuiness with Non-Compliance With Procurement Law in violation of 29 *Del. C.* § 6903.[34] This count arose from McGuiness's decision to award MCG a state contract totaling less than $50,000 so that the contract would not be subject to a public bidding process.[35] Additionally, the State posited that the invoices issued under that contract were artificially divided into amounts totaling less than $5,000 in order to circumvent review by the Delaware Division of Accounting.[36] The State also alleged that, after a State employee objected to the contracts being awarded to a political campaign company, MCG established another company called Innovate Consulting, and McGuiness awarded Innovate Consulting contracts totaling $77,500.[37]

---

[33] *Id.*

[34] *Id.* at A36 (Indictment). 29 *Del. C.* § 6903 provides that "Any person, who, with intent to avoid compliance with this chapter, wilfully fragments or subdivides any contract for the purchase of materiel, nonprofessional services, public works or professional services, shall be subject to the penalties listed in this section."

[35] *Id.* at A36–37 (Indictment).

[36] *Id.* at A37 (Indictment).

[37] *Id.* at A38 (Indictment).

Count IV of the Indictment charged McGuiness with Official Misconduct in violation of 11 *Del. C.* § 1211.[38] Count IV alleged that McGuiness engaged in misconduct relating to Daughter's employment and the MCG contract with an intent to obtain a personal benefit and with knowledge that the conduct was unauthorized.[39]

Count V charged McGuiness with Act of Intimidation in violation of 11 *Del. C.* § 3532.[40] The State alleged that McGuiness used email surveillance and discriminatory office policies to target whistleblowers in a knowing attempt to prevent or dissuade employees from testifying against her.[41]

---

[38] *Id*. at A39 (Indictment). Under 11 *Del. C.* § 1211(1) and (3), "A public servant is guilty of official misconduct when, intending to obtain a personal benefit or to cause harm to another person, the public servant knowingly does any of the following:

> (1) Commits an act constituting an unauthorized exercise of official functions, knowing that the act is unauthorized.

> (3) Performs official functions in a way intended to benefit the public servant's own property or financial interests under circumstances in which the public servant's actions would not have been reasonably justified in consideration of the factors which ought to have been taken into account in performing official functions."

[39] *Id*. at A39–40 (Indictment).

[40] *Id*. at A40 (Indictment). 11 *Del. C.* § 3532 provides that "every person who knowingly and with malice prevents or dissuades (or who attempts to prevent or dissuade) any witness or victim from attending or giving testimony at any trial, proceeding or inquiry authorized by law is committing an act of intimidation and is guilty of a class D felony. A person who knowingly and with malice retaliates against any victim or witness who has attended or given testimony at any trial proceeding or inquiry authorized by law by committing any crime as defined by the laws of this State against such victim or witness is committing an act of intimidation and is guilty of a class D felony."

[41] *Id*. at A41.

## B. Pre-Trial Proceedings

Following her indictment, McGuiness vigorously defended the charges against her, resulting in extensive motion practice before the trial court. We summarize the relevant pretrial proceedings with as much brevity as possible in light of the wide-ranging issues raised on appeal.

### 1. Motion for Appointment of Private Counsel

McGuiness filed her first motion just days after the grand jury returned the Indictment. McGuiness retained private counsel to represent her in the criminal proceedings and sought to have her counsel's fees paid by the State. Under Delaware law, when a State employee is the subject of litigation arising from her employment, the employee is entitled to representation by the DOJ. But when, as here, the employee is facing criminal charges filed by the State, the DOJ is conflicted and cannot represent the employee's legal interests. In her Petition for Appointment of Private Counsel, McGuiness reasoned that under Delaware Supreme Court Rule 68, the DOJ's conflict allowed her to retain private counsel at the State's expense.[42] Under Rule 68(f), "the court may appoint an attorney from the private bar, if the court is satisfied that such [DOJ] conflict exists or may exist."[43]

---

[42] *Id*. at A43 (Petition for Appointment of Private Counsel for a State Officer).

[43] *Id*. (quoting Supr. Ct. R. 68(f)).

10

In response to the petition, the State argued that under 10 *Del. C.* § 3925,[44] McGuiness was required to first seek appointment of counsel from the Delaware Office of Defense Services ("ODS") or the Office of Conflicts Counsel ("OCC"),[45] not a lawyer from the private bar whose fees typically are substantially higher than the fees paid to OCC attorneys.[46] The State further argued that because ODS did not have a conflict in McGuiness's case, her petition should be denied.[47] The State also contended that, to the extent Supreme Court Rule 68 and Section 3925 differ as to the procedures for appointing counsel, the statute controls.[48]

---

[44] 10 *Del. C.* § 3925 provides that "[a]ny public officer or employee, in a criminal or civil action against the person arising from state employment, shall be entitled to petition the court for a court-appointed attorney to represent the person's interests in the matter. If the judge, after consideration of the petition, examination of the petitioner and receipt of such further evidence as the judge may require, determines that the petition has merit, the judge shall appoint an attorney to represent the interests of such public officer or employee. The court-appointed attorney shall represent such person at all stages, trial and appellate, until the final determination of the matter, unless the attorney is earlier released by such person or by the court. The court may first appoint an attorney from the Department of Justice. If the court determines that the Department is unable to represent such public officer or employee, the court may appoint an attorney from the Office of Defense Services in criminal actions only, and in civil actions may appoint an attorney licensed in this State. This section shall also apply to all federal courts within this State."

[45] The Office of Defense Services represents indigent criminal defendants in Delaware, and the Office of Conflicts Counsel appoints members of the private bar to represent indigent criminal clients whom the Office of Defense Services cannot represent due to a conflict.

[46] App. to Opening Br. at A98 (State's Response in Opposition to Petition for Appointment of Private Counsel). McGuiness's counsel charged $550 per hour in her case whereas conflicts counsel is paid $100 per hour. A44 (Defendant's Petition for Appointment of Private Counsel for a State Officer); A104 (State Response in Opposition to Defendant's Petition for Appointment of Private Counsel for a State Officer).

[47] *Id*. at A101 (State's Response in Opposition to Petition for Appointment of Private Counsel).

[48] *Id*. at A102 (State's Response in Opposition to Petition for Appointment of Private Counsel).

In denying the petition, the Superior Court held that McGuiness had bypassed Section 3925's requirement that she first seek appointment of counsel from ODS.[49] Private counsel continued to defend McGuiness through trial and on appeal.

### 2. Motion to Compel Discovery

The State produced some initial discovery to McGuiness on December 17, 2021.[50] That production included emails from McGuiness's state email account, spreadsheets with casual-seasonal employees' compensation, Daughter and Daughter's friend's employment paperwork and compensation information, Daughter's state email correspondence, and financial information regarding the MCG and Innovate Consulting contracts.[51] The State's letter indicated that the data from certain digital devices was not included in the production because the filter team had not yet completed its review.[52]

McGuiness filed a motion to compel discovery on January 31, 2022, arguing that the State had failed to provide all discoverable materials in its possession.[53] In her January Motion to Compel, McGuiness sought discovery relating to her theory that she was being subjected to a "selective prosecution" because the conduct

---

[49] *State v. McGuiness*, 2021 WL 5013826 (Del. Super. Oct. 28, 2021).

[50] App. to Opening Br. at A158 (Defendant's Discovery Request); App. to Answering Br. at B32 (State's Response to Defendant's Discovery Request).

[51] App. to Answering Br. at B32–34 (State's Response to Defendant's Discovery Request).

[52] *Id*. at B34 (State's Response to Defendant's Discovery Request).

[53] App. to Opening Br. at A156 (Mot. to Compel Discovery).

forming the basis of her criminal charges was common in state government, but no other State official or employee had ever been prosecuted.[54] The Superior Court granted the January motion in part because it held that McGuiness had demonstrated a "colorable basis" for a selective prosecution defense by adequately alleging some elements of that claim.[55]

### 3. Motion to Dismiss Count V and Motion for a Bill of Particulars

In February 2022, McGuiness moved to dismiss Count V of the Indictment.[56] In that motion, she argued that the indictment was facially deficient as to Count V because it insufficiently described McGuiness's knowledge of the proceedings or witnesses against her and therefore failed to provide her with sufficient notice as to the conduct for which she was being prosecuted.[57] The State argued in response that the indictment provided sufficient detail regarding the nature of the whistleblowers' allegations and McGuiness's efforts to prevent the whistleblowers from testifying, specifically by surveilling their emails and enacting office policies targeting whistleblowers.[58]

---

[54] *Id*. at A163–66 (Mot. to Compel Discovery).

[55] *State v. McGuiness*, 2022 WL 1184407, at *2 (Del. Super. Apr. 13, 2022).

[56] App. to Opening Br. at A228 (Mot. to Dismiss Count V).

[57] *Id*. at A233–34 (Mot. to Dismiss Count V).

[58] *Id*. at A253–55 (State's Response to Mot. to Dismiss Count V).

Also pending before the court was McGuiness's Motion for a Bill of Particulars filed in November 2021.[59] In that motion, McGuiness sought clarity and additional facts regarding all five counts.[60] Before responding to the motion, and before the court could rule on it, the State filed a superseding indictment against McGuiness on March 28, 2022 (the "Superseding Indictment").[61] The Superseding Indictment did not add any new charges, but it expanded the date range corresponding to Counts IV and V and added facts to support Count III.[62] The State then responded to McGuiness's motion the next day, arguing that the additional facts in the Superseding Indictment mooted McGuiness's arguments as to Count III and that her argument concerning the other counts sought information that need not be contained in an indictment, such as the State's theory of the case.[63] McGuiness responded with a supplemental motion for a bill of particulars, maintaining her previous arguments and contending that the Superseding Indictment did not rectify the lack of factual allegations.[64]

---

[59] *Id*. at A128 (Mot. for Bill of Particulars).

[60] *Id*. at A131–41 (Mot. for Bill of Particulars).

[61] *Id*. at A270 (Superseding Indictment).

[62] *Id*.

[63] *Id*. at A266 (State's Response to Mot. for Bill of Particulars).

[64] *Id*. at A283–85 (Supplemental Mot. for Bill of Particulars).

The Superior Court issued a memorandum opinion on April 21, 2022, granting in part and denying in part McGuiness's Motion for a Bill of Particulars.[65] The court granted her motion as to Counts III and V, holding that if the State planned to introduce contracts in support of Count III other than those awarded to MCG, it must provide those contracts to McGuiness.[66] The court also held that Count V of the indictment was insufficiently particular because it did not identify the names of the witnesses whom McGuiness was accused of intimidating. The court directed the State to provide that information to McGuiness.[67]

A week later, in May 2022, the court denied McGuiness's Motion to Dismiss Count V, holding that the Superseding Indictment sufficiently alleged that she acted with the requisite knowledge and intent to dissuade the whistleblowers from testifying against her.[68] The court also held that although the indictment did not set forth a specific date by which McGuiness had knowledge of the investigation, the State had clarified during oral argument that she had knowledge of the investigation no later than September 11, 2021, the day she was served with a grand jury subpoena.[69]

---

[65] *State v. McGuiness*, 2022 WL 1410034 (Del. Super. Apr. 21, 2022).

[66] *Id*. at *2.

[67] *Id*.

[68] *State v. McGuiness*, 2022 WL 1489572, at *2 (Del. Super. May 2, 2022).

[69] *Id*. at *3.

### 4. Motion to Dismiss Count III and Motion to Dismiss the Indictment

In April 2022, McGuiness filed a Motion to Dismiss Count III of the Indictment along with a Motion to Dismiss the Indictment or Alternatively to Sanction the State for Discovery Violations.[70] In her Motion to Dismiss Count III, McGuiness argued that the State changed its theory as to Count III in the Superseding Indictment by abandoning the multiple invoice theory and adopting a new theory that each invoice was paid from different sources.[71] These facts, McGuiness argued, were vague and failed to allege that her conduct was illegal.[72] McGuiness also argued that Count III should be dismissed because the facts contained within it had been known to the State at the time it obtained the first Indictment, and the delay in presenting the Superseding Indictment to the grand jury had prejudiced McGuiness.[73]

In its response to the motion, the State argued that because Count III of the Superseding Indictment did not charge McGuiness with a new crime, and because the Superseding Indictment did not change the State's theory of Count III, but rather

---

[70] App. to Opening Br. at A301 (Mot. to Dismiss Count III); A378 (Mot. to Dismiss or Sanction).

[71] *Id.* at A318 (Mot. to Dismiss Count III).

[72] *Id.* at A319 (Mot. to Dismiss Count III).

[73] *Id.* at A314–17 (Mot. to Dismiss Count III).

explained the allegations in greater detail, McGuiness had failed to demonstrate prejudice.[74]

The Superior Court denied the motion on May 13, 2022, holding that the indictment sufficiently alleged that McGuiness had engaged in conduct satisfying all the elements of 29 *Del. C.* § 6903.[75] The court found that the indictment specifically alleged that McGuiness divided payments under the MCG contract to circumvent the Delaware Division of Accounting's review, which the court held met Section 6903's "fragmenting or subdividing" element.[76]

In her Motion to Dismiss the Indictment or Alternatively Sanction the State, McGuiness contended that on April 8, 2022, the State produced electronically stored information ("ESI") consisting of 511,255 documents collected from some of the devices it had seized when it executed the search warrant in September 2021.[77] McGuiness argued that this delayed production severely prejudiced her ability to prepare for trial because she could not reasonably review all the documents in the six or seven weeks remaining before trial.[78] McGuiness further contended that because the State waited seven months to produce the documents, which were in its

---

[74] *Id*. at A373–74 (State's Response to Mot. to Dismiss Count III).

[75] *State v. McGuiness*, 2022 WL 1538488, at *3 (Del. Super. May 13, 2022).

[76] *Id*. at *3–4.

[77] App. to Opening Br. at A379 (Mot. to Dismiss the Indictment or Alternatively Sanction the State).

[78] *Id*. at A388 (Mot. to Dismiss the Indictment or Alternatively Sanction the State).

possession throughout that period, it had violated both its discovery obligations and its obligation under *Brady v. Maryland*[79] to disclose exculpatory or impeachment evidence.[80]

McGuiness asked the court to dismiss the Superseding Indictment because the prejudice caused by the late production could not be cured by a trial continuance, namely because she intended to run for re-election in the fall of 2022 and wanted the trial to be complete before the election.[81] McGuiness alternatively asked the court to sanction the State for the late production by ordering it (i) not to introduce any of the newly produced evidence at trial; (ii) to pay the costs she incurred reviewing the voluminous discovery on an expedited basis; and (iii) to confirm that the newly produced evidence did not include exculpatory evidence.[82]

In response to this motion, the State acknowledged that it had recently produced a large volume of discoverable information, specifically data obtained from McGuiness's computer and Daughter's laptops, but contended that much of the data included emails and attachments from McGuiness's email account to which she maintained access during the pendency of the litigation and that the State had already

---

[79] 373 U.S. 83 (1963).

[80] App. to Opening Br. at A390–92 (Mot. to Dismiss the Indictment or Alternatively Sanction the State).

[81] *Id*. at A393 (Mot. to Dismiss the Indictment or Alternatively Sanction the State).

[82] *Id*. at A394–95 (Mot. to Dismiss the Indictment or Alternatively Sanction the State).

produced in December 2021.[83] The State explained that the delayed production occurred because the computer and laptops' password protection and encryption required the State to hire a third-party vendor to search the data, which began in February 2022.[84] After data was extracted from the laptops and computer, the filter team finished sorting through the privileged and confidential communications in late April 2022.[85] Notably, the State provided McGuiness with the discovery weeks before its own prosecution team had access to the materials.[86]

The Superior Court decided the motion on May 18, 2022, granting some of the requested discovery sanctions but denying the ultimate sanction of dismissal.[87] The court agreed with the State that much of the ESI in the new production was previously available to McGuiness, including OAOA network files and McGuiness's and Daughter's state email.[88] The court also pointed out that the State had produced the ESI in a searchable format, allowing McGuiness to identify exculpatory information in a timely fashion.[89] The court held that although the State violated the

---

[83] *Id*. at A440–44 (Response in Opposition to Mot. to Dismiss the Indictment or Alternatively Sanction the State).

[84] *Id*. at A453 (Response in Opposition to Mot. to Dismiss the Indictment or Alternatively Sanction the State Ex. B).

[85] *Id*. at A454 (Response in Opposition to Mot. to Dismiss the Indictment or Alternatively Sanction the State Ex. B).

[86] *Id*.

[87] *State v. McGuiness*, 2022 WL 1580601 (Del. Super. May 18, 2022).

[88] *Id*. at *5.

[89] *Id*.

court's discovery deadlines by making the late production, it did not do so in bad faith, and dismissing the Indictment therefore was not warranted.[90] The Superior Court further held that McGuiness had not established a claim under *Brady* because she had not demonstrated prejudice.[91] The court ultimately precluded the State from introducing any of the newly produced evidence in its case-in-chief.[92] The trial court also offered to continue the trial, which McGuiness declined out of concerns regarding the upcoming election.

### 5. Pre-Trial Venue Change

On May 26, 2022, which was to be the first day of trial, McGuiness first challenged whether venue was properly maintained in New Castle County because none of the events described in the Indictment occurred there.[93] The State conceded that Kent County was the proper venue and thereafter entered a *nolle prosequi* on all the indicted counts.[94] The State then re-indicted McGuiness in Kent County, and on June 6, 2022, a Kent County grand jury returned an indictment substantively identical to the previous Superseding Indictment.[95]

---

[90] *Id.* at *4.

[91] *Id.* at *5.

[92] *Id.* at *4.

[93] Answering Br. at 1.

[94] App. to Answering Br. at B263 (State's Letter).

[95] App. to Opening Br. at A796 (Kent County Indictment). *See* A769 (State's Letter Identifying Slight Amendments to Indictment).

20

McGuiness then argued one more motion to dismiss in early June 2022 before trial began.[96] McGuiness renewed her motions that the court previously denied, contending that it should reconsider its holdings in light of the case's relocation to Kent County.[97] The court issued an order the next day, on June 9, ordering that its decisions in the New Castle County case would be binding in the Kent County proceedings.[98]

**C. Trial**

The trial began on June 14, 2022.[99] In total, 28 witnesses testified for the State, most of whom were current and former state employees.[100] Six witnesses testified for McGuiness, including Investigator Robinson, whom McGuiness re-called as a witness after he testified for the State.[101] On June 30, 2022, the parties

---

[96] *Id*. at A784 (Omnibus Mot. to Dismiss).

[97] *Id*. at A786 (Omnibus Mot. to Dismiss).

[98] *Id*. at A1066–67 (June 9, 2022 Order).

[99] *Id*. at A2607; A2629 (Trial Tr.).

[100] *See id*. at A2685 (Sclesky Direct Exam.); A2698 (Spano Direct Exam.); A2777 (Hyler Direct Exam.); A2793 (Grossman Direct Exam.); A2815 (Reuban Direct Exam.); A2861 (Purdy Direct Exam.); A2890 (Herron Direct Exam.); A2995 (Cole Direct Exam.) A3058 (Bateman Direct Exam.); A3066 (Robinson Direct Exam.); A3282 (Maurice Direct Exam.); A3304 (Vargas Direct Exam.); A3353 (Schenck Direct Exam.); A3399 (Hamilton Direct Exam.); A3470 (Burd Direct Exam.); A3605 (Gross Direct Exam.); A3770 (Elizabeth McGuiness Direct Exam.);A3794 (Ziamba Direct Exam.);A3881 (Vasilikos Direct Exam.); A3908 (Moore Direct Exam.); A3969 (Van Horn Direct Exam.); A4113 (Thomas Direct Exam.); A4187 (Cousin Direct Exam.); A4239 (Elder Direct Exam.) A4254 (Haw-Young Direct Exam.) A4344 (Zolper Direct Exam.); A4350 (Horsey Direct Exam.); A4677 (Moreau Direct Exam.).

[101] *See id*. at A4525 (Bayline Direct Exam.); A4560 (Robinson Direct Exam.); A4735 (Gulli Direct Exam.); A4810 (Marshall Direct Exam.); A4847 (August Direct Exam.); A4898 (Mitchell-Rogers Direct Exam.).

gave their closing arguments and the jury began its deliberations.[102]  The following

day, on July 1, the jury returned a verdict finding McGuiness guilty of Counts I, III,

and IV and not guilty of Counts II and V.[103]

### D. Post-Trial Proceedings

After the jury returned its verdict, McGuiness moved for judgment of acquittal

and a new trial.[104]  In her Motion for Judgment of Acquittal, McGuiness contended

that the court should enter judgment in her favor on Counts I, III, and IV.[105]  As to

Count I, McGuiness posited that the State failed to introduce evidence sufficient for

a rational jury to conclude that Daughter had received benefits that other casual-

seasonal employees in her same position did not receive.[106]  As to Count III,

McGuiness reasserted her argument that Count III failed to charge her with criminal

conduct.[107]  She alternatively argued that the State had not offered any evidence as

to McGuiness's *mens rea* when structuring the MCG and Innovate Consulting

contracts and therefore did not meet its burden of proof.[108]

---

[102] *Id*. at A4974 (State's Closing Argument); A4006 (Defense's Closing Arguments); A5077 (Charge to the Jury). McGuiness raised several motions during trial, some of which renewed arguments she raised before trial began.  To the extent these motions are relevant to the appeal, we identify them within our analysis of McGuiness's appellate arguments.

[103] *Id*. at A5115–16 (Verdict).

[104] *Id*. at A1104 (Mot. for Judgment of Acquittal); A1474 (Mot. for New Trial).

[105] *Id*. at A1141 (Mot. for Judgment of Acquittal).

[106] *Id*. at A1106–08 (Mot. for Judgment of Acquittal).

107 *Id*. at A1120, n.2 (Mot. for Judgment of Acquittal).

108 *Id*. at A1116–24 (Mot. for Judgment of Acquittal).

McGuiness also argued that the court should enter a judgment of acquittal as to Count IV because (i) a guilty verdict on that count was predicated on the jury finding her guilty of Counts I or III—which she argued could not stand,[109] (ii) the State had failed to present evidence that she knowingly committed an unauthorized act when she hired Daughter,[110] (iii) the State failed to present evidence that McGuiness intended to benefit her own financial interests when she hired Daughter,[111] and (iv) Count IV was multiplicitous of Counts I and III and therefore offended the Constitution's prohibition against double jeopardy.[112]

In her Motion for a New Trial, McGuiness argued that a new trial was justified because (i) the State continued to withhold exculpatory evidence in violation of its *Brady* obligations even after the Court denied McGuiness's Motion to Dismiss the Indictment;[113] (ii) the court improperly admitted character evidence as to Count V, which then spilled over into the other counts for which she was found guilty;[114] (iii) the State's theory of Count III evolved such that McGuiness did not have adequate notice of the conduct for which she was charged;[115] (iv) the court improperly

---

[109] *Id*. at A1125 (Mot. for Judgment of Acquittal).

[110] *Id*. at A1126 (Mot. for Judgment of Acquittal).

[111] *Id*. at A1128 (Mot. for Judgment of Acquittal).

[112] *Id*. at A1132–35 (Mot. for Judgment of Acquittal).

[113] *Id*. at A1477 (Mot. for New Trial).

[114] *Id*. at A1502 (Mot. for New Trial).

[115] *Id*. at A1518 (Mot. for New Trial).

commented on Investigator Robinson's credibility when it stated that McGuiness's counsel was unfairly implying that Robinson was "lying";[116] (v) Count IV was multiplicitous of Counts I and III;[117] and (vi) the cumulative effect of these errors mandated a new trial.[118]

The Superior Court addressed both motions in an August 30, 2022 opinion in which it denied McGuiness's Motion for a New Trial, granted her Motion for Judgment of Acquittal as to Count III, and denied her Motion for Judgment of Acquittal as to Counts I and IV.[119] In granting her Motion for Judgment of Acquittal as to Count III, the court agreed with McGuiness that the State had failed to prove that she intentionally fragmented one contract into multiple contracts in violation of Section 6981.[120] The court further held that because Section 6981 does not criminalize conduct that fragments multiple payments under one invoice, the State's evidence of such conduct was not sufficient to support a conviction.[121]

The court then denied McGuiness's Motion for Judgment of Acquittal as to Counts I and IV, reasoning that the State had met its burden of proving that Daughter received benefits that other casual-seasonal employees did not—namely the ability

---

[116] *Id*. at A1526 (Mot. for New Trial).

[117] *Id*. at A1528 (Mot. for New Trial).

[118] *Id*. at A1529 (Mot. for New Trial).

[119] *State v. McGuiness*, 2022 WL 3971195 (Del. Super. Aug. 30, 2022).

[120] *Id*. at *5.

[121] *Id*.

to work remotely while attending college.[122]  The court further held that Count IV included conduct that exceeded the conduct within the scope of Counts I and III such that Count IV was not multiplicitous.[123]

The Superior Court also denied McGuiness's Motion for a New Trial.  As to her *Brady* arguments, the court held that she had not sufficiently alleged ongoing *Brady* violations because the State's delayed production of ESI did not amount to a suppression of exculpatory evidence, and the State was not aware of potential witnesses who could have testified that Daughter's benefits were equivalent to OAOA's other casual-seasonal employees.[124]

As to McGuiness's remaining arguments in support of her Motion for a New Trial, the court held that evidence of McGuiness's conduct toward employees before September 11, 2021, was relevant and properly admitted as to Count V because the State argued that McGuiness knew of the investigation well before she received the grand jury subpoena.[125]  The court rejected McGuiness's contention that the court's comment regarding Robinson's testimony was improper, holding that the trial judge has discretion to control the mode of defense counsel's cross-examination and, even

---

[122] *Id*. at *3.

[123] *Id*. at *7.

[124] *Id*. at *8–9.

[125] *Id*. at *10.  The court also held that McGuiness's argument regarding Count III was moot because the court granted her Motion for Judgment of Acquittal as to Count III. *Id*. at *11.

if the comment was improper, the jury instructions cured any prejudice.[126]  Finally, the court denied the motion as to cumulative error because McGuiness failed to demonstrate that any of the errors caused her prejudice that resulted in an unfair trial.[127]

The Court sentenced McGuiness on October 19, 2022, to serve one year at Level V incarceration suspended for one year at Level I probation for Count I, and one year at Level V incarceration suspended for one year at Level I probation for Count IV.[128]  The court also ordered McGuiness to pay a $10,000 fine for Count I, restitution for Count IV, and the costs of the prosecution.[129]  McGuiness timely appealed her convictions.

## ANALYSIS

McGuiness raises eight arguments on appeal.  In her first two arguments, she contends that the State violated her due process rights under *Brady v. Maryland* by delaying the production of voluminous discovery until less than two months before trial was scheduled to start and by impeding her efforts to investigate and raise selective or vindictive prosecution defenses.  McGuiness next challenges each of her

---

[126] *Id*. at *11–12.  The court also held that McGuiness's multiplicity argument was unsupported for the same reasons it denied McGuiness's Motion for Judgment of Acquittal as to Count IV—that Counts I, III, and IV encompassed different conduct. *Id*. at *13.

[127] *Id*.

[128] App. to Opening Br. at A5146 (Sentencing Tr.).

[129] *Id*.

convictions for various reasons, including that (i) the State did not admit sufficient evidence to support her conviction for Count I; (ii) the improper admission of character evidence relating to Count V prejudiced the jury's consideration of Counts I and IV; (iii) the trial court's failure to dismiss Count III before the case was submitted to the jury resulted in evidence that prejudicially spilled over into the jury's deliberations as to the other counts; and (iv) Counts I and IV were multiplicitous—and therefore violated double jeopardy principles—because they penalized the same conduct. McGuiness also contends that the Superior Court's comments in the jury's presence concerning Investigator Robinson's veracity amounted to an unconstitutional comment on the witness's credibility and entitle her to a new trial. Lastly, McGuiness argues that the court erred when it denied her motion to appoint private counsel at State expense, and she asks the court to remand that issue for further proceedings.

## A. McGuiness's arguments arising under *Brady v. Maryland* and its progeny

In her first two arguments on appeal, McGuiness maintains that the State violated her due process rights by failing to meet its obligation under *Brady v. Maryland*[130] to disclose exculpatory and impeachment evidence within its possession. First, McGuiness argues that the State violated her constitutional rights by producing a large volume of ESI less than two months before her scheduled trial

---

[130] 373 U.S. 83 (1963).

and by then failing to properly search that ESI for exculpatory evidence. Second, she contends that she was entitled, under *Brady*, to the names of the attorneys who participated in drafting inaccurate statements in the affidavit of probable cause that supported the warrant to search OAOA files. McGuiness argues that either or both of these violations entitle her to a new trial. We review questions of law *de novo*, including issues surrounding the State's obligation to disclose exculpatory or impeachment evidence.[131]

> 1. **McGuiness is not entitled to a new trial based on the State's delayed production of ESI.**

McGuiness first argues that the State suppressed a substantial amount of ESI until two months before trial and that this suppression fatally undermines confidence in the trial's fairness and the jury's verdict. McGuiness contends that the State's delayed production of this volume of discovery, coupled with its failure to search the ESI for exculpatory or impeachment evidence and point McGuiness to it, resulted in an unfair trial in violation of her due process rights under the Fourteenth Amendment to the United States Constitution. We disagree that the State's delayed production violated *Brady* and further hold that the proper remedy for the State's delayed production, if any, was a continuance of the trial, which the Superior Court offered and McGuiness refused.

---

[131] *Risper v. State*, 250 A.3d 76, 87 (Del. 2021); *Wright v. State*, 91 A.3d 972, 982 (Del. 2014).

28

Under the United States Supreme Court's decision in *Brady*, the government violates a defendant's due process rights if the prosecution suppresses or withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.[132] The State's *Brady* obligations arise from a prosecutor's responsibility to "search for truth" in criminal cases[133] and are founded on the premise that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair."[134] Under *Brady* and its progeny, the State must produce exculpatory and impeachment evidence in its possession to a defendant when that evidence could be material to a case's outcome.[135] A prosecutor therefore is charged with learning of any evidence favorable to the defense and "known to the others acting on the government's behalf in the case, including the police."[136]

A defendant who alleges that her *Brady* rights were violated bears the burden of proving three elements: (1) evidence exists that is favorable to the defendant because it is exculpatory or impeaching; (2) the State suppressed that evidence; and

---

[132] *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Brady*, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution.").

[133] *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

[134] *Brady*, 373 U.S. at 87.

[135] *Risper*, 250 A.3d at 90; *Wright*, 91 A.3d at 972.

[136] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Wright*, 91 A.3d at 988.

(3) the suppression prejudiced the defendant.[137]  The State argues that McGuiness has not met her burden to prove any, let alone all, of these elements.

McGuiness argues that the State's delayed production of ESI violated *Brady* in two ways.  First, she maintains that the State had an affirmative obligation to search the ESI for exculpatory or impeachment information and provide it to McGuiness, the State failed to do so, and this failure alone warrants a new trial.[138] Second, she contends that specific information contained within the ESI was exculpatory, but the delayed production prevented her counsel from finding that evidence and using it at trial, which also violated *Brady*.

As to McGuiness's first argument, we cannot conclude in these circumstances that the State's failure to review every file within the ESI for exculpatory material violated *Brady*.  Caselaw does not support McGuiness's contention that *Brady* requires the State to meticulously review the ESI—which was obtained from computers belonging to McGuiness and her daughter—to specifically identify exculpatory or impeaching information.  To the contrary, courts that have considered similar issues have concluded that the government generally satisfies *Brady* by

---

[137] *United States, v. Bagley*, 473 U.S. 667, 674–75 (1985); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (holding that impeachment evidence falls within the State's *Brady* obligations); *Risper*, 250 A.3d at 90; *Starling v. State*, 882 A.2d 747, 756 (Del. 2005).

[138] Opening Br. at 12.

adopting an open file policy,[139] ensuring that the file includes the information known to other government agencies, including the police,[140] and directing a defendant to exculpatory evidence of which the government is aware.[141]

For example, in *U.S. v. Warshak*, the Sixth Circuit Court of Appeals held that the government satisfied *Brady* by adopting an open file policy, even though the file contained a substantial amount of ESI that the government had not painstakingly reviewed for exculpatory evidence.[142]  In so holding, the *Warshak* court expressly rejected the same argument that McGuiness advances here, *i.e.*, that the State "was obliged to sift fastidiously through evidence—the vast majority of which came from [defendant]—in an attempt to locate anything favorable to the defense."

---

[139] *See, e.g., United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("To charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an unreasonable extension of the *Brady* rule. The courts, rightly in our view, have refused to make it.  The government is not 'obliged to shift fastidiously' through millions of pages (whether paper or electronic). . . . It is 'under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence.'"); *United States v. Warshak*, 631 F.3d 266, 296–98 (6th Cir. 2010) (holding that the government did not "abdicate" its *Brady* obligations by adopting an open file policy that contained millions of electronic documents when there was no evidence that the government acted in bad faith or deliberately concealed evidence); *United States v. Skilling*, 554 F.3d 529, 576–77 (5th Cir. 2009) *rev'd on other grounds*, 561 U.S. 358 (2010) (finding that the government's use of an open file policy for a file that consisted of several hundred million pages of documents did not violate *Brady*); *United States v. Gross*, 424 F. Supp. 3d 800, 803–04 (C.D. Cal. 2019) (holding that the government's open file production of ESI consisting of six million pages of documents did not violate *Brady* when the government did not conceal exculpatory material in the voluminous production, pad its file with pointless information to increase the defendant's burden, or otherwise act in bad faith).

[140] *Kyles*, 514 U.S. at 437; *Wright*, 91 A.3d at 988.

[141] *Gray*, 648 F.3d at 567; *Starling*, 130 A.3d at 333; *Wright*, 91 A.3d at 988.

[142] *Warshak*, 631 F.3d at 296–98.

The *Warshak* court relied, in part, on the Fifth Circuit Court of Appeals' decision in *United States v. Skilling*,[143] which similarly rejected the defendant's argument that the government's open file consisting of several hundred million pages of documents resulted in "the effective concealment of a huge quantity of exculpatory evidence."[144] The Seventh Circuit Court of Appeals also has adopted the *Warshak* and *Skilling* courts' interpretation of *Brady*.[145] McGuiness has not pointed to a single authority supporting her contrary position.

All those courts cautioned that the government must act in good faith and refrain from either padding an open file with superfluous information or producing the file in a manner that impedes a defendant's ability to review the information.[146] This interpretation of *Brady* is consistent with its due process roots. *Brady* is intended to ensure that a defendant receives a fair trial and can present an effective defense. At the same time, the prosecution cannot realistically be charged with searching each electronic document within a voluminous file for material that may be exculpatory.[147]

---

[143] 554 F.3d 529 (5th Cir. 2009).

[144] *Id*. at 576.

[145] *Gray*, 648 F.3d at 567.

[146] *Warshak,* 631 F.3d at 297–98; *Skilling*, 554 F.3d at 577.

[147] It is not disputed that the government must point a defendant to exculpatory evidence of which the government becomes aware. That is not the issue raised in this appeal.

In McGuiness's case, the trial court found that the State acted in good faith in producing the ESI, and McGuiness points to no evidence that the State intentionally padded the production in order to conceal *Brady* material. The State provided the ESI to McGuiness as soon as it was available, and the record does not support the conclusion that the State intentionally or recklessly delayed processing the ESI to prevent McGuiness from using it in her own defense.[148] Rather, the encryption and filtering issues that contributed to the delayed production were matters largely outside the State's control. Once decrypted, the files were produced to McGuiness even before they were provided to the prosecution team. If anything, the delayed production prejudiced the State because the Superior Court sanctioned the State for violating discovery deadlines by precluding the prosecution from using the newly produced ESI in its case-in-chief.[149] We can discern no *Brady* violation from these facts.

McGuiness also argues that the delayed production prevented her from finding and using exculpatory evidence at trial. She points to two categories of

---

[148] *McGuiness*, 2022 WL 1580601, at *3 (Del. Super. May 18, 2022) ("While the State['s] justification reflects their failure to use a commonsense management of potential critical documents, there is nothing to suggest they did so in bad faith or to obtain a litigation advantage."). *See Gray*, 648 F.3d at 567–68 ("the government cannot make disclosure until the exculpatory evidence comes into its possession . . . that did not happen here until mid-trial; nor was the delay deliberate or otherwise in bad faith. As soon as the government received the evidence it turned it over to the defense—which had time to use it but did not do so.").

[149] *McGuiness*, 2022 WL 1580601, at *4 (Del. Super. May 18, 2022).

"exculpatory" documents that she argues were effectively suppressed by the State's delayed production: (1) eleven "List of Authorized Positions" reports (the "LAP Reports"),[150] and (2) OAOA documents bearing Daughter's name or listing her as the file custodian.[151] McGuiness does not carry her burden of proof under *Brady* with respect to any of this evidence.

First, McGuiness has not established that the evidence to which she points is exculpatory. Evidence is exculpatory if it is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[152] McGuiness argues that the LAP Reports identify other casual-seasonal employees who received some of the same employment benefits as Daughter, thereby undermining the State's theory that Daughter received benefits not available to other employees in her same classification. McGuiness argues that these reports show that other casual-seasonal employees were paid more than Daughter in the relevant timeframe, and at least three other casual-seasonal employees were permitted—like Daughter—to work remotely while attending college. As explained below regarding the sufficiency of the evidence for Count I, even without these LAP Reports, the defense presented evidence to the jury that OAOA casual-seasonal employees hired

---

[150] Opening Br. at 15–17.

[151] Reply Br. at 4–5.

[152] *Brady*, 373 U.S. at 87.

34

in 2021 received benefits similar to Daughter, and the jury nevertheless convicted McGuiness of Count I. McGuiness has not established the materiality of this additional evidence.

McGuiness fares no better with her argument that a group of OAOA documents were exculpatory because they contained Daughter's name or listed her as file custodian. McGuiness advances this argument in a single paragraph in her reply brief without explaining how the documents weaken the State's position that Daughter was paid without performing any work.[153] The fact that OAOA documents used Daughter's name or listed her as file custodian does not demonstrate that Daughter performed work commensurate with her compensation, and McGuiness does not otherwise elaborate on this argument.

Second, McGuiness has not shown that the State suppressed the ESI obtained from the laptops. McGuiness correctly points out that suppression under *Brady* is not limited to cases where the government altogether fails to produce exculpatory or impeachment evidence to a defendant. Suppression also occurs when the government's belated disclosure of exculpatory or impeachment evidence precludes

---

[153] McGuiness did not mention this category of documents in her opening brief, and the argument therefore is waived. Supr. Ct. R. 14(b)(vi)(A)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal."). Moreover, McGuiness argues that these documents were found in a "cursory analysis" of the ESI, directly contradicting her contention that the defense team could not effectively use the ESI. Reply Br. at 4.

a defendant from effectively presenting or using the evidence.[154]  But the State cannot disclose evidence that it does not have, and the record shows that the State provided the ESI to McGuiness as soon as it was available.  The delayed production was directly attributable to the decryption and filtering the State was required to undertake to convert the ESI to a useable format.

McGuiness also has not shown that the delay prevented her counsel from using the material "with some degree of calculation and forethought."[155]  Once the ESI was decrypted, the State produced it in a searchable format.  When the prosecution team obtained access to the ESI—which was after McGuiness received it—the State provided McGuiness with a report regarding the materials contained in the ESI.  Additionally, at least some of the evidence included in the ESI was duplicative of evidence provided to McGuiness in December 2021, including OAOA network files, McGuiness's and Daughter's state email records, and OAOA employees' correspondence with Daughter using her personal email account.  The ESI was drawn from computers that belonged to McGuiness and Daughter, who presumably were familiar with their contents and able to assist counsel with

---

[154] *Risper*, 250 A.3d 76, 91 ("[t]he opportunity for use under *Brady* . . . [includes] the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought.") (quoting *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001)); *Dickens v. State*, 437 A.2d 159 (Del. 1981) ("[w]hile the State may have violated the rule in [*Brady*], the defense has not demonstrated that the tardy disclosure prevented it from effectively presenting the evidence.").

[155] *Risper*, 250 A.3d at 91 (quoting *Leka*, 257 F.3d at 101).

identifying relevant material. Moreover, the trial court offered McGuiness a continuance, which would have allowed her counsel additional time to utilize the ESI. McGuiness made the strategic decision to decline the continuance because of her political plans regarding the election, but that choice is not a basis on which she may seek a new trial.

Finally, McGuiness has not shown that she was prejudiced by the delayed production. Evidence is "material" within *Brady*'s prejudice prong when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."[156] Although a defendant is not required to show that disclosure of the suppressed evidence would have resulted in an acquittal, *Brady* also does not require a reviewing court to order a new trial whenever a defendant turns up "evidence possibly useful to the defense but not likely to have changed the verdict."[157] Ultimately, the question is whether the government's suppression of evidence undermines confidence in the trial's outcome.[158] The evidence McGuiness identified, even if possibly useful to her defense, was not likely to change the jury's verdict. To the contrary, its exculpatory value was at best questionable, and even on appeal McGuiness could not identify material within the

---

[156] *Smith*, 565 U.S. at 75 (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).

[157] *Wright*, 91 A.3d at 988 (quoting *Giglio*, 405 U.S. at 154).

[158] *Id*.

production that carried a reasonable likelihood of changing the trial's outcome.  Her

*Brady* claim regarding the ESI therefore fails.

**2.      McGuiness is not entitled to a new trial or to additional discovery relating to her vindictive or selective prosecution theories.**

McGuiness next argues that she was entitled under *Brady* to know the names

of the attorneys who contributed to false statements contained in the September 2021

search warrant for OAOA files.  She argues that the trial court's refusal to compel

the State to disclose that information prevented her from exploring selective and

vindictive prosecution defenses.

McGuiness first raised the specter of selective or vindictive prosecution in her

initial discovery requests, which sought, among other things, the production of (i)

state agency personnel policies prohibiting or limiting nepotism in State

employment; (ii) contracts for professional services in the amount of $50,000 or less

entered into by the DOJ or any other state agency within a specified date range; and

(iii) the identity of, and compensation received by, any person, firm, or entity

employed by the DOJ or the State of Delaware who made "any campaign

contributions" during a specified date range.[159]  The State objected to those requests,

although it produced a copy of the DOJ's anti-nepotism policy.  McGuiness then

---

[159] *McGuiness*, 2022 WL 1184407, at \*3 (Del. Super. Apr. 13, 2022).

moved to compel, arguing that the evidence sought was relevant to a "selective prosecution defense."[160]

The trial court granted McGuiness's motion in part, holding that she had presented "a 'colorable basis' for a selective prosecution defense" by alleging that she was the first person criminally prosecuted under 29 *Del. C.* §§ 5805 and 6903, even though others in state government acted similarly.[161]  Based on McGuiness's allegations, the court ordered the State to produce the following information:

> 1. The name and job description of any employee, full-time or seasonal, who is or was hired by the office of a statewide elected official and who fits within the category of a "close relative" as defined by Chapter 29 of the Delaware Code, between January 1, 2019, and the present[;] and[]
> 2. All professional service contracts in the amount of $50,000 or less, between January 1, 2019 and the present that were approved by the Attorney General and/or the Governor.[162]

The trial court denied the motion to compel as to all the other information McGuiness sought.

In April 2022, McGuiness filed a motion seeking an evidentiary hearing to establish that law enforcement included false allegations in the affidavit supporting the September 2021 search warrant application and that the fruits of that warrant

---

[160] *Id*. at *4–5.

[161] *Id*. at *5.

[162] *Id*. at *6.

therefore should be suppressed under *Franks v. Delaware*.[163]  The trial court

conducted an evidentiary hearing at which Investigator Robinson testified about the

averments in the warrant application as compared to the facts known to the DOJ at

the time it applied for the warrant.[164]  At the hearing's conclusion, the trial court held

that the information contained in Paragraph 24 of the affidavit was "critical" to the

application, "inaccurate," and "placed in there to imply that the defendant reduced

invoices to less than $5,000 to avoid oversight by the [Division] of Accounting."[165]

The court therefore suppressed the documents related to the false statements.[166]

At trial, Robinson testified several times that the warrant's inaccuracies were

attributable to the "investigative team" as a whole, including multiple lawyers.[167]

Robinson's testimony during the *Franks* hearing had not referred to other team

members' participation in drafting the affidavit.  Robinson also acknowledged at trial

that several of the statements were "false" and contrary to other information known

at the time.[168]  Based on Robinson's trial testimony, McGuiness asked the State to

(i) identify the attorneys who participated in the affidavit's drafting, and (ii) produce

---

[163] 438 U.S. 154, 155 (1978).  *See* App. to Opening Br. at A699–758 (Defendant's Mot. to Suppress and Request for a *Franks* Hearing).

[164] *See* App. to Opening Br. at A2451–2531 (Suppression Hearing Tr.).

[165] *Id*. at 2528–29 (Suppression Hearing Tr.).

[166] *Id*.  The Court held that the State could use the documents if it established that it obtained them from a source independent of the warrant.

[167] *Id*. at A4481, A4487–88, A4494–96 (Trial Tr. – Robinson).

[168] *Id*. at A4484, A4486, A4487 (Trial Tr. – Robinson).

any communications between Robinson and any DOJ lawyer or investigator regarding the affidavit.[169] The State told McGuiness that the members of the investigative team involved in drafting the affidavit included lead trial counsel and the Chief Deputy Attorney General, as well as other DOJ attorneys.[170] The State, however, refused to produce any communications regarding the affidavit's contents, and the trial court denied McGuiness's motion to compel any such production.[171]

McGuiness argues on appeal that she was entitled under *Brady* to know the names of the attorneys who drafted the inaccurate statements and to see their communications regarding the warrant application. She contends that the evidence would have been exculpatory or impeaching because it would have (i) contributed to her investigation and possible use of defenses for selective or vindictive prosecution, and (ii) undermined the investigation's thoroughness and good faith.

McGuiness again fails to carry her burden with respect to *Brady*, even when we consider this evidence in combination with the State's delayed production of ESI.[172] First, McGuiness has not shown that the names of the attorneys who

---

[169] *Id*. at A1989 (Email from Defense Counsel to DOJ).

[170] *Id*. at A4554–55 (Trial Tr.).

[171] *Id*. at A4559 (Trial Tr.).

[172] *See Wright*, 91 A.3d at 990 (holding that a reviewing court must consider the cumulative prejudicial effect of undisclosed *Brady* evidence); *cf. Kyles*, 514 U.S. at 440–41 (reversing a conviction because it was unclear whether the Court of Appeals considered the cumulative materiality of the *Brady* evidence).

participated in drafting the affidavit or the investigative team's internal communications regarding those averments were remotely related to any cognizable claim for selective or vindictive prosecution. Although McGuiness places significant emphasis on the fact that the trial court previously held that she had alleged a "colorable" basis for a selective prosecution defense, that finding did not entitle her to unlimited discovery into tangential information in support of theoretical defenses for which she adduced no further support. Second, McGuiness has not shown that the trial court's refusal to compel production of this information prejudiced her defense in this case.

McGuiness's *Brady* claim first falters because she failed to show that the information would have been exculpatory or impeaching. Specifically, she does not explain how the information at issue would help her investigate or prove either selective or vindictive prosecution. It is true that the State may not selectively enforce the law based on a defendant's protected status, such as race or gender.[173] Selective enforcement of that sort would violate the Fourteenth Amendment's Equal Protection Clause.[174] But a defendant's burden to prove selective prosecution or selective enforcement is a demanding one.[175]

---

[173] *See Whren v. United States*, 517 U.S. 806, 813 (1996); *Drummond v. State*, 909 A.2d 594, 2006 WL 2842732, at *2 (Del. Oct. 5, 2006) (TABLE).

[174] *Whren*, 517 U.S. at 813.

[175] *Drummond*, 2006 WL 2842732, at *2 (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).

To make a *prima facie* case of selective prosecution, two elements must be established. The defendant must show that (1) the policy to prosecute or enforce the law had a discriminatory effect and (2) it was motivated by a discriminatory purpose. To show a discriminatory effect, the defendant must show that a similarly situated person [not in the protected class] could have been arrested for the same offense for which the defendant was arrested, but was not. To show discriminatory purpose, the defendant must demonstrate that intent to discriminate was a 'motivating factor in the decision to enforce the criminal law against the defendant.'[176]

McGuiness did not attempt to argue or provide a basis for any of these elements in either the trial court or on appeal. McGuiness never identified the protected class in which she contends she falls. She likewise has not explained how the evidence at issue would have helped her make out a *prima facie* showing of selective enforcement.

McGuiness has similarly failed to identify any factual basis to support a vindictive prosecution claim.[177] The United States Supreme Court has recognized that claims for vindictive prosecution may arise when an individual is prosecuted because they exercised constitutionally protected rights such as freedom of speech or the right to appeal a conviction.[178] McGuiness has neither articulated what constitutional right she ostensibly exercised that prompted the prosecution nor

---

[176] *Drummond*, 2006 WL 2842732, at *2 (internal quotations and citations omitted).

[177] We note that the trial court never found that McGuiness articulated even a "colorable" basis for a *vindictive* prosecution claim. *Compare McGuiness*, 2022 WL 1184407, at *3 (Del. Super. Apr. 13, 2022) ("The Court finds that Defendant presents a 'colorable basis' for a *selective* prosecution defense and will permit discovery.").

[178] *See Acara v. Cloud Books, Inc.*, 478 U.S. 697 (1986); *Blackledge v. Perry*, 417 U.S. 21 (1974).

explained how the purported *Brady* evidence would be relevant to establishing a vindictive prosecution claim.

McGuiness also does not carry her burden with respect to *Brady*'s prejudice component. Even when we consider this evidence cumulatively with the State's late production of ESI, McGuiness has not shown that there is a reasonable probability that the additional information would have changed the jury's verdict. McGuiness argues that the information would have undermined the jury's confidence in the investigation. But McGuiness pointedly demonstrated to the jury that the investigative team obtained a search warrant based on an affidavit that contained false statements.[179] And McGuiness emphasized that evidence in closing arguments to the jury:

> Here's what you know for sure: Chief Investigator Robinson made repeated false statements under oath in a search warrant application in front of a judge and then to a grand jury, and in this trial . . . we learned it wasn't just his mistake. That search warrant was reviewed by a special team of investigators and lawyers and they still got it horribly wrong. Can you trust that special team of investigators and lawyers to get it right now?[180]

A review of the trial record demonstrates that McGuiness's counsel effectively highlighted the deficiencies in the State's investigation. She was permitted to present evidence of those deficiencies and argue their implications to the jury.

---

[179] *See* App. to Opening Br. at A4481–4574 (Trial Tr.).

[180] *Id*. at A5008 (Trial Tr.). *See also id.* at A5016–17 (pointing out several times that statements in the affidavit were false and the investigation therefore could not be trusted).

McGuiness has not established that the individual attorneys' names or the investigative team's internal communications were reasonably likely to alter the jury's verdict.

For all the foregoing reasons, we conclude that the State did not violate McGuiness's due process rights under *Brady v. Maryland*.

**B. The sufficiency of the evidence supporting Count I**

McGuiness next argues that the trial court erred in denying her motion for judgment of acquittal as to Count I. We review a trial court's decision on a motion for judgment of acquittal *de novo*, specifically deciding "whether any rational trier of fact, viewing the evidence and all the reasonable inferences to be drawn therefrom in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of the crime."[181]

Count I charged McGuiness with Conflict of Interest relating to the hiring and supervision of Daughter as an OAOA casual-seasonal employee. The charge arose under 29 *Del. C.* § 5805, which defines "prohibitions relating to conflicts of interest" for State employees, officers, and officials. Section 5805 relevantly provides:

> a) Restrictions on exercise of official authority. (1) No state employee, state officer or honorary state official may participate on behalf of the State in the review or disposition of any matter pending before the State in which the state employee, state officer or honorary state official has a personal or private interest, provided, that upon request from any person with official responsibility with respect to the matter, any such

---

[181] *Hopkins v. State*, 293 A.3d 145, 150 (Del. 2023).

person who has such a personal or private interest may nevertheless respond to questions concerning any such matter. A personal or private interest in a matter is an interest which tends to impair a person's independence of judgment in the performance of the person's duties with respect to that matter.

(2) A person has an interest which tends to impair the person's independence of judgment in the performance of the person's duties with respect to any matter when:

a. Any action or inaction with respect to the matter would result in a financial benefit or detriment to accrue to the person or a close relative to a greater extent than such benefit or detriment would accrue to others who are members of the same class or group of persons;

For purposes of Count I, the State was required to prove that McGuiness was a "state officer" at the time of the charged offense, she participated on the State's behalf in reviewing or disposing of a matter pending before the State, and she had a personal or private interest in that matter as defined by Section 5008.[182] The trial court instructed the jury that the "simple hiring of one's close relative, without more, is not a crime."[183] On appeal, McGuiness only challenges whether the State presented sufficient evidence regarding Count I's "personal or private interest" element.

Count I's "personal or private interest" element required the jury to decide whether, as a result of her employment with OAOA, financial benefits accrued to Daughter that were greater than those received by "others who are members of the

---

[182] *See* App. to Opening Br. at A1073–74 (Jury Instructions).

[183] *Id*. at A1074 (Jury Instructions).

same class or group of persons."[184] McGuiness argues that, in denying her motion for judgment of acquittal, the trial court improperly limited its comparison of Daughter's employment benefits to those received by the handful of casual-seasonal employees hired at the same time as Daughter.[185] McGuiness further argues that, even if that small group comprised the "class or group of persons" to which Daughter should be compared, the State did not present sufficient evidence of the benefits received by that group.[186]

Having reviewed the record, we conclude that the trial court properly denied McGuiness's motion for judgment of acquittal as to Count I. The jury was charged with making the factual determination as to which employees fell within the "same class or group of persons" as Daughter. McGuiness argued to the jury that the group should include all OAOA's casual-seasonal workers employed in 2020 and 2021.[187] The State presented the jury with two alternative theories: (1) the relevant class or group of persons comprised only those casual-seasonal employees who, like Daughter, were employed at the beginning of the COVID-19 pandemic and before McGuiness knew she was under investigation;[188] and (2) even if the jury considered

---

[184] 29 *Del. C.* § 5008(2)(a); *see* App. to Opening Br. at A1073 (Jury Instructions).

[185] Opening Br. at 28–29.

[186] *Id*. at 29–30.

[187] *See* App. to Opening Br. at A5026–27, A5038 (Trial Tr.).

[188] *See id*. at A5063–64 (Trial Tr.).

the broader group for which McGuiness advocated, including those casual-seasonal employees hired in 2021, none of the employees received the same cumulative benefits as Daughter.[189]

The State presented evidence in support of both its theories, and a rational trier of fact could have found McGuiness guilty beyond a reasonable doubt under either theory. As to the group of employees to whom Daughter should be compared, the State presented evidence from which the jury could conclude that the comparator group should be the casual-seasonal employees hired around the same time as Daughter. Specifically, the State offered evidence that Daughter and Daughter's friend were hired at the beginning of the pandemic as casual-seasonal employees, were employed without being interviewed by OAOA staff, and were paid more than two of the other three casual-seasonal workers whom OAOA employed at that time.[190] A number of those employees lost hours at work while Daughter and Daughter's friend were working at or close to the maximum hours permitted for casual-seasonal employees.[191] Daughter was allowed to continue working remotely when she returned to college out of state, but no other casual-seasonal employees

---

[189] *See id*. at A4978–4982 (Trial Tr.).

[190] *Id*. at A3290 (Maurice Direct Exam), A3059 (Bateman Direct Exam.), A3994 (Van Horn Direct Exam.), A3779 (Elizabeth McGuiness Direct Exam.), A3807 (Ziamba Direct Exam.); A3314 (Vargas Direct Exam.).

[191] *Id*. at A3099–3101 (Robinson Direct. Exam.).

were offered that opportunity until after McGuiness likely was aware that Daughter's employment was being scrutinized.[192]

As to the State's second theory, the State offered evidence that, even if the jury considered all of OAOA's casual-seasonal employees in 2020 and 2021, no single employee received the same cumulative benefits as Daughter. To this end, the State offered evidence that no casual-seasonal employee other than Daughter was permitted to work the number of hours she worked at the hourly rate she received, while also being permitted to work remotely and "bank" extra hours for use in future weeks.

Because there was evidence from which a rational jury could find that the State met the statutory elements of this charge beyond a reasonable doubt, the trial court correctly denied McGuiness's motion for judgment of acquittal as to Count I.

## C. The trial court's admission of evidence relating to Count V

McGuiness next argues that the trial court erred in allowing the State to admit evidence in support of Count V that had no logical relevance to that charge. McGuiness contends that this inadmissible evidence prejudiced her and constituted improper character evidence. Count V charged McGuiness with "Act of Intimidation" on the basis that, while acting in her capacity as an elected official and

---

[192] *Id*. at A3061–63 (Bateman Direct Exam.), A3366 (Schenk Cross Exam.), A3776 (Elizabeth McGuiness Direct Exam.).

49

public servant, McGuiness knowingly and maliciously attempted to prevent or dissuade witnesses from giving testimony against her in the DOJ investigation or the trial.[193] The indictment alleged that between March 1, 2019 and March 25, 2022, McGuiness surveilled the communications of potential whistleblowers or adverse witnesses, monitored employees' email, discriminated against employees who questioned her misconduct, enacted office policies to limit interactions between current and former employees, and engaged in several intimidating acts, directly and indirectly, after she became aware of the investigation into her conduct.[194]

Under 11 *Del. C.* § 3532, McGuiness could be found guilty of an Act of Intimidation if the State proved that she "knowingly and with malice prevent[ed] or dissuade[d] (or [] attempted to prevent or dissuade) any witness or victim from attending or giving testimony at any trial, proceeding or inquiry authorized by law." McGuiness repeatedly argued to the trial court that she was not aware of the DOJ investigation until September 11, 2021, when she received a grand jury subpoena, and any evidence of her conduct toward employees before that date therefore was irrelevant for purposes of Count V. The State, however, argued that although McGuiness unquestionably was aware of the investigation when she received the September 2021 subpoena, the State had evidence that she knew about the

---

[193] *Id*. at A282 (Superseding Indictment Count V).

[194] *Id*. at A280–82 (Superseding Indictment Count V).

investigation before that date and was using "intimidating tactics" to impede employees from reporting her conduct.[195]

McGuiness continued to object before and during trial to the relevance of evidence regarding her conduct toward employees before September 11, 2021.[196] The trial court overruled those objections. At trial, the State argued that the evidence showed McGuiness was aware of the investigation no later than June 2021,[197] and the State further argued to the jury that McGuiness's other conduct toward employees, including monitoring their State email in real time, showed that she was aware of the investigation in 2020.[198]

The jury ultimately acquitted McGuiness of Count V. She argues on appeal, however, that the trial court's evidentiary rulings allowed the jury to hear irrelevant and inadmissible character evidence that prejudiced the jury's consideration of the other charges against her. We review the trial court's evidentiary rulings for abuse of discretion.[199] "An abuse of discretion occurs when a court has exceeded the

---

[195] *Id*. at A693 (State's Response to Def.'s Mot. *in Limine*).

[196] In addition to moving to dismiss Count V, McGuiness also filed a motion *in limine* to exclude evidence relating to her conduct before September 2021. The trial court denied that motion. *See Id*. at A530 (Mot. *in Limine*); A2570–71 (Pretrial Hearing Tr.).

[197] *Id*. at A4997–5001 (Trial Tr.). The State's evidence that McGuiness was aware of the investigation in June 2021 was based on Robinson's call to Daughter's friend on June 15, 2021, which immediately triggered calls from McGuiness and her Chief of Staff.

[198] *Id*. at A4995–96 (Trial Tr.).

[199] *Milligan v. State*, 116 A.3d 1232, 1235 (Del. 2015).

51

bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice [] as to produce injustice."[200]

In our view, the trial court did not abuse its discretion in admitting most of the evidence at issue. Although McGuiness maintained throughout trial that she was not aware of the investigation until she received the subpoena in September 2021, the trial court properly allowed the State to present evidence to the contrary. The DOJ began receiving whistleblower complaints in April 2020 alleging that McGuiness was engaged in misconduct.[201] Those complaints came from OAOA employees who expressed concerns about retaliation.[202] The State presented evidence and argued to the jury that McGuiness's decision to begin monitoring certain employees' emails shortly after the 2020 complaints were made, and her discipline and termination of whistleblowers in early 2021, was evidence that she was aware of the complaints and the investigation well before she received the subpoena. The trial court did not err in concluding that this evidence was relevant or that its probative value was not substantially outweighed by its prejudicial effect.[203] The evidence also was not improper character evidence; the State presented McGuiness's conduct toward

---

[200] *Chaverri v. Dole Food Co.*, 245 A.3d 927, 935 (Del. 2021) (*en banc*) (quoting *Senu-Oke v. Broomall Condo., Inc.*, 77 A.3d 272, 2013 WL 5232192, at *1 (Del. Sept. 16, 2013) (TABLE) (ORDER) (citations omitted)).

[201] App. to Opening Br. at A4153–54, 4244, 4354–55 (Trial Tr.).

[202] *Id*.

[203] *See* D.R.E. 403. The evidence related directly to one of the indicted charges.

52

employees beginning in April 2020 as direct evidence of the crime for which she was charged.[204]

McGuiness argues that the trial court also erred in admitting evidence of her conduct toward employees in 2019, even before complaints first were made to the DOJ.[205] We agree that this evidence was not relevant to Count V and its admission therefore amounted to error. The evidence, however, was limited in both scope and presentation, and we conclude that its admission was harmless.

An error is harmless when, "the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction."[206] The jury acquitted McGuiness of Count V, but she argues the irrelevant evidence prejudiced the jury's consideration of the other counts. The record does not show prejudice occurred in this instance. The jury's not-guilty verdict with respect to Count V strongly suggests that it was not swayed by the irrelevant evidence. McGuiness argues that the jury's guilty verdict for Count III establishes prejudice because the trial court later acquitted McGuiness of this charge.[207] But, as we later discuss, the trial court

---

[204] *See* D.R.E. 403, 404(b).

[205] App. to Opening Br. at A3533–38 (trial testimony regarding McGuiness seeking former employees' passwords and monitoring employee email in 2019); A3883–98 (trial testimony that witness worked in 2019 and early 2020 for OAOA before leaving because the environment was "oppressive" and "toxic"); A4125–30 (trial testimony regarding McGuiness monitoring employee email and yelling at employees in 2019).

[206] *Cooke v. State*, 97 A.3d 513, 547 (Del. 2014) (quoting *Nelson v. State*, 628 A.2d 69, 77 (Del. 1993) (citation omitted)).

[207] Opening Br. at 40.

acquitted McGuiness of Count III because the charge was legally insufficient. And because we separately have concluded that McGuiness's conviction for Count IV must be reversed, Count I is the only remaining count to consider for purposes of our harmless error analysis. We already have concluded that the admissible evidence relating to Count I was sufficient to allow the jury to convict McGuiness beyond a reasonable doubt. The trial court's error in admitting some of the evidence relating to Count V therefore does not warrant a new trial.

## D. The prejudicial spillover of evidence from Count III to Count IV

McGuiness next argues that she is entitled to a new trial because the Superior Court's failure to dismiss Count III before trial allowed the jury to hear "highly prejudicial evidence and instruction, which spilled over to the remaining [c]ounts."[208] McGuiness's argument on this point relies on the doctrine of "prejudicial spillover," which addresses whether evidence relating to a vacated conviction affected the jury's consideration of any remaining, closely linked charges.[209] Although Delaware has not yet adopted a test for determining whether prejudicial spillover occurred, the Third Circuit employs a well-defined two-step test that we believe is an appropriate standard to apply to spillover arguments.[210]

---

[208] *Id*. at 42.

[209] *Wright*, 665 F.3d at 575.

[210] *See, e.g. United States v. Murphy*, 323 F.3d 102, 122 (3d Cir. 2003); *United States v. Cross*, 308 F.3d 308, 318–19 (3d Cir. 2002); *United States v. Pelullo*, 14 F.3d 881, 898–99 (3d Cir. 1994).

When properly preserved, prejudicial spillover is a question of law that we review *de novo*.[211] Although the dissent contends that plain error review applies because this issue was not preserved for appeal, we respectfully disagree. McGuiness challenged Count III's legal sufficiency several times before and during trial, but the trial court consistently rejected that argument and allowed the jury to consider the evidence and return a verdict. McGuiness could not reasonably be expected to raise a theoretical prejudicial spillover argument in her post-trial motion in anticipation that the trial court would finally adopt her legal insufficiency argument.[212]

Count III charged McGuiness with "Structuring: Non-Compliance with Procurement Law" relating to the December 2019 contract that McGuiness executed with MCG for "communication services." Because the contract was for $45,000, it fell below the State's $50,000 threshold for public bidding. The State, however, alleged that McGuiness artificially split payments to MCG to reduce the invoices below $5,000 so that the Delaware Division of Accounting did not need to approve payments under the contract. The State alleged that McGuiness violated 29 *Del. C.*

---

[211] *See United States v. Fattah*, 914 F.3d 112, 186 (3d Cir. 2019) ("We exercise plenary review over a district court's denial of a claim of prejudicial spillover.").

[212] Just as a party need not reassert an issue in a motion for reargument in order to preserve it for appeal, *see Allen v. Scott*, 257 A.3d 984, 992 (Del. 2021), we cannot realistically expect parties to re-raise arguments in post-trial motions and also present all the possible permutations of those previously rejected arguments. To hold otherwise would only increase the burden on our trial courts.

§ 6903 by intentionally subdividing payments under the MCG contract to avoid compliance with the State's Procurement Code.[213]

McGuiness consistently argued to the trial court that Count III was legally insufficient because it failed to charge her with a criminal offense.[214] The trial court rejected that legal argument both when it denied McGuiness's pre-trial motion to dismiss and when it deferred ruling during trial on her multiple motions for judgment of acquittal as to Count III.[215] After trial, however, the court entered judgment of acquittal in McGuiness's favor as to Count III, belatedly adopting her view that 29 *Del. C.* §§ 6891 and 6903 do not criminalize subdividing invoices into amounts less than $5,000 to avoid review by the Division of Accounting.[216] The court held that, although such conduct violates the State's accounting procedures, it does not fall within the conduct criminalized in Section 6903.[217]

McGuiness now argues on appeal that the trial court's delay in recognizing Count III's legal insufficiency allowed the jury to hear a substantial amount of evidence that it would not otherwise have heard, and that evidence "spilled over" into the jury's consideration of the remaining counts, particularly Counts I and IV.

---

[213] App. to Opening Br. at A278–79.

[214] *See id.* at A317–20 (Def.'s Mot. to Dismiss Count III).

[215] *McGuiness*, 2022 WL 1538488 (Del. Super. May 13, 2022). *See also May 17 2022 decision denying Mot. for reargument;* App. to Opening Br. at 4695–4733, 4968–69 (Trial Tr.).

[216] *McGuiness*, 2022 WL 3971195 (Del. Super. Aug. 30, 2022).

[217] *Id.*

The State responds that McGuiness has not shown prejudicial spillover in this case, arguing in particular that the evidence relating to Count III was also relevant—and therefore independently admissible—with respect to Count IV.[218]

*United States v. Wright* provides the clearest statement of the Third Circuit's prejudicial-spillover test, which that court has taken to calling the "*Wright* spillover test."[219] The *Wright* test typically applies when two charges are "closely linked" and an appellate court vacates a conviction on one of them.[220] The Third Circuit has, however, applied the *Wright* spillover test in the context of a trial court's acquittal of one closely linked charge, as happened in this case.[221]

It is plain that Counts III and IV were closely linked; Count IV charged McGuiness with Official Misconduct, and some of the misconduct that the State alleged in Count IV also formed the basis for Count III. Specifically, the State alleged that McGuiness committed Official Misconduct by (1) hiring Daughter and Daughter's friend into State employment and affording Daughter benefits not available to other state employees (*i.e.* the conduct that formed the basis for Count I); or (2) "structuring payments in a no-bid contract to a political campaign

---

[218] Answering Br. at 43–44.

[219] *See Fattah*, 914 F.3d at 188.

[220] *See Wright*, 665 F.3d at 575.

[221] *See Fattah*, 914 F.3d at 188 ("The District Court's acquittal of Vederman on the RICO count establishes that step one of the *Wright* spillover test has been met.").

consulting company" (*i.e.* the conduct that formed the basis for Count III).[222]  The trial court instructed the jury that "[i]n order to find the Defendant guilty of Official Misconduct, you must unanimously agree that one or both of these allegations have been established by the State.  To be clear, you must be unanimous in which act occurred, if any."[223]  Because the charges are closely linked and the Superior Court acquitted McGuiness of Count III after trial because of the charge's legal sufficiency, it is appropriate to apply the *Wright* spillover test to determine whether prejudicial spillover occurred with respect to Count IV.[224]

The *Wright* spillover test employs two steps for assessing prejudicial spillover claims.  First, a reviewing court considers "whether the jury heard evidence that would have been inadmissible at a trial limited to the remaining valid count[s]."[225]  If the jury did not hear evidence that would have been inadmissible, the inquiry ends and any conviction on the remaining valid counts stands.[226]  If, however, any

---

[222] App. to Opening Br. at A1082 (Jury Instructions).

[223] *Id*. at A1082–83 (Jury Instructions).

[224] McGuiness argued in passing that her conviction on Count I also resulted from prejudicial spillover.  *See* Opening Br. at 45.  But Counts I and III were not closely linked charges.  To the contrary, they involved entirely separate allegations of misconduct.  The *Wright* prejudicial spillover test applies only in the context of closely linked charges.

[225] *Wright*, 665 F.3d at 575 (quoting *Cross*, 308 F.3d at 317).

[226] *Id*.

evidence would have been inadmissible, the court proceeds to the second step: determining whether that evidence was prejudicial.[227]

*Wright's* first step requires us to examine the evidence introduced at trial and determine whether any evidence would have been inadmissible in a "hypothetical trial" on the remaining valid counts.[228] That analysis can be somewhat textured; *Wright* instructs courts to consider, among other things, not only the relevance of certain evidence but also any likely limitations on relevant evidence's admissibility under Rules 403 and 404.[229] *Wright* also, however, "acknowledg[ed] the generous discretion that [the evidence rules] vest in district courts."[230] In our view, that discretion—and the associated standard of review we apply to a trial court's evidentiary decisions—counsels against concluding that evidence would have been inadmissible when it is a close question.

Notwithstanding the State's argument to the contrary, McGuiness meets the first step of the *Wright* test. First, even if we accepted the theoretical basis for the State's position that Count III evidence would have been independently admissible to prove Official Misconduct for Count IV, that is not the theory that the State presented at trial. The record shows that the State effectively treated Count III as a

---

[227] *Id.*

[228] *Id.*

[229] *Id.* at 576.

[230] *Id.* at 576.

predicate offense for Count IV. The State argued to the jury in closing that "if you find that the defendant committed unauthorized acts, an act unauthorized in Count 1 . . . , Count 2 . . . , or Count 3 of structuring, not all, but any, then you can consider whether the defendant intended to gain some personal benefit by committing these acts."[231] The jury instructions likewise came close to treating Counts I and III as predicate offenses to Count IV. In other words, neither the State's closing argument nor the jury instructions suggest that the State pursued the theory that McGuiness's invoice splitting amounted to Official Misconduct even if those actions were not criminal under Count III.

Moreover, even if the State had pursued that theory at trial, it is unlikely that the trial court would have admitted much of the payment-structuring evidence in the absence of Count III. The State's closing argument bears this out. In discussing Count III, the State noted: "Let's be real. 90 percent of this trial was seemingly spent on the intricacies and the technicalities of this one charge."[232] That statement emphasizes the admissibility concerns that would have arisen regarding this evidence—including under Rules 403 and 404—had Count III been dismissed before trial.

---

[231] App. to Opening Br. at A4991–92 (Trial Tr.).

[232] *Id*. at A4986 (Trial Tr.).

Because we conclude that the jury heard evidence that would not have been admissible without Count III, the *Wright* spillover test's first step is satisfied, and we must examine whether the otherwise inadmissible evidence was prejudicial. The *Wright* test prescribes four factors that a reviewing court weighs to determine whether the evidence was prejudicial, specifically whether:

> (1) the charges are intertwined with each other; (2) the evidence for the remaining counts is sufficiently distinct to support the verdict on these counts; (3) the elimination of the invalid count significantly changed the strategy of the trial; and (4) the prosecution used language of the sort to arouse a jury.[233]

As with most factor-based tests, the analysis is a fact-intensive, case-by-case inquiry.

We first must consider whether Counts III and IV are so intertwined "as to create substantial confusion on the part of the jury."[234] Courts undertaking this inquiry have considered, among other things, whether the same facts underlie both the defective count and the valid count,[235] and whether the jury instructions "intermingled" the prosecution's legal theories.[236] "[M]ere relatedness," however, is not always enough to find prejudice.[237] McGuiness has established that Counts

---

[233] *Wright*, 665 F.3d at 575 (quoting *Murphy*, 323 F.3d at 118).

[234] *United States v. Lee*, 612 F.3d 170, 181 (3d Cir. 2010) (quoting *Pelullo*, 14 F.3d at 898).

[235] *See Wright*, 665 F.3d at 576–77 ("The same facts underlay both Count Ten (honest services) and Count Twelve (traditional) . . . .").

[236] *Id.*

[237] *See Fattah*, 914 F.3d at 188. In *Fattah*, the Third Circuit held that a predicate offense for bribery was not intertwined with the compound racketeering charge. But *Fattah* involved the converse to the situation presented here; in *Fattah* the trial court acquitted the defendant of the compound racketeering offense. The Third Circuit held that "[r]egardless of the evidence pertaining solely to

61

III and IV were so intertwined that there was a risk of confusion on the jury's part. The instructions given to the jury came close to treating Count III (Structuring) as a predicate to Count IV (Official Misconduct). Moreover, the State expressly argued to the jury that, if it found McGuiness guilty of Count III, it could consider whether she obtained a personal benefit from structuring the payments in the manner alleged and therefore convict her of Count IV.

The second factor in step two of the *Wright* test examines whether there was evidence supporting the remaining valid counts that did not also support the defective count.[238] In other words, whereas the first factor examines the charges, the second factor examines the evidence supporting the charges. This factor weighs against finding prejudicial spillover in this case. Even if evidence related to the Structuring charge had been excluded entirely, the jury received sufficient evidence to convict McGuiness of Conflict of Interest, which also supported the Official Misconduct charge.

---

the [racketeering] conviction, the evidence supporting [] the bribery charges . . . would have remained the same." *Id*. Here, however, McGuiness was acquitted by the court of the predicate offense, and the evidence admitted for the compound offense would not have been the same. Although Count IV could have remained in the case because it also was premised on Counts I and II, the evidence admitted for Count IV would not have included the Count III evidence.

[238] *See Wright*, 665 F.3d at 577; *Lee*, 612 F.3d at 182 ("The second *Pelullo* factor asks whether the evidence relating to each charge was sufficiently distinct that a verdict as to one could be supported without reference to evidence regarding the other.").

Next, when addressing whether elimination of the invalid count would have significantly changed the government's trial strategy, a reviewing court "assess[es] the extent to which the parties would have called different witnesses and, correspondingly, the extent to which their opening and closing arguments would have differed."[239] In *Wright*, the court considered the evidence and arguments that the parties "would not have needed to present" if the defective charge had not proceeded to trial.[240] As we previously explained, if the Superior Court had dismissed Count III before trial, the parties arguably would not have offered or addressed any evidence involving the MCG contract. At a minimum, the trial court likely would not have permitted the State to spend such a substantial portion of the trial presenting that evidence. We cannot confidently conclude that the State's trial strategy (or McGuiness's for that matter) would have been the same had Count III not remained in the case.[241]

Finally, in evaluating the prosecution's use of language to arouse the jury, a reviewing court generally focuses on the government's opening statements and closing arguments.[242] The court considers whether the prosecution's language was so pejorative or inflammatory as to damage the defendant in ways that would not

---

[239] *Wright*, 665 F.3d at 577 (citing *Lee*, 612 F.3d at 182–83; *Pelullo*, 14 F.3d at 898–99).

[240] *Id*.

[241] The State did not address this factor in its brief.

[242] *See Wright*, 665 F.3d at 577.

have occurred if the improper charge was not at issue.[243] We agree with McGuiness that there is a substantial risk that the State's rhetoric regarding Count III inflamed the jury in this case. For example, the State was permitted to portray McGuiness as someone who deliberately broke the State's fiscal rules, which are the same rules that she was elected to ensure others followed.[244]

Accordingly, three of the four factors in *Wright*'s prejudice test support finding prejudicial spillover. Although the second factor weighs against finding prejudice, we are not persuaded that this single factor outweighs our findings with respect to the other three. We recognize that the jury unanimously convicted McGuiness of Count I, which also served as a predicate to Count IV, but we cannot confidently conclude that the jury would have convicted McGuiness of Count IV irrespective of the evidence relating to Count III.

We reach that conclusion because the State blended Counts I and III when it argued Count IV's personal-benefit element to the jury. Recall that, to convict McGuiness of Official Misconduct in Count IV, the jury needed to find that she

---

[243] *Id*.; *Cross*, 308 F.3d at 317 ("Of the four factors, this one most clearly highlighted the damage done by the evidence related to Count 54. Because the District Court allowed the Government to introduce the evidence supporting Count 54, the defendant 'was not only branded as a convicted felon and a racketeer by the government, but also portrayed as a person associated with the Mafia.'")(quoting *United States v. Ivic*, 700 F.2d 51, 65 (3d Cir. 2002)).

[244] *See, e.g.* App. to Opening Br. at A2607 ("Delaware's Auditor of Accounts, the public official designed to ensure that others follow the State's fiscal rules, was instead[] the one breaking those rules."); A4991 ("McGuiness knew just how to play the system, and she did.").

64

intended to obtain a personal benefit in connection with the charged misconduct.[245] In arguing that McGuiness received such a benefit, the State relied on the evidence collectively supporting Counts I and III. Specifically, the State argued that McGuiness received a "personal benefit" by using social media campaigns, giveaways, and events directed by Daughter and MCG to personally promote herself and advance her political career.[246] Based on this record, we cannot conclude that the jury would have found that the State established a personal benefit if it only considered the evidence supporting Count I. Accordingly, although the second factor weighs against finding prejudice, the remaining factors support such a finding.

Having concluded that both parts of the *Wright* spillover test are satisfied, we hold that there was prejudicial spillover between Counts III and IV, and we therefore reverse McGuiness's conviction for Count IV and remand that count to the Superior Court for a new trial on that charge.

### E. McGuiness's multiplicity argument

McGuiness next argues that Counts I and IV were unconstitutionally multiplicitous and her convictions therefore should be reversed.[247] The "multiplicity doctrine" arises from the constitutional prohibition against double jeopardy and

---

[245] *Id*. at A1082 (Jury Instructions).

[246] *Id*. at A4992–93, A5067–86 (Trial Tr.).

[247] Although we have reversed McGuiness's conviction for Count IV, this issue is not moot because the State may seek to retry McGuiness on that count, which it could not do if we conclude that Counts I and IV are multiplicitous.

prohibits the State from "dividing one crime into multiple counts by splitting it into a series of temporal or spatial units."[248] We review claims of multiplicity *de novo*.[249]

The Double Jeopardy Clauses in the United States and Delaware Constitutions protect a person against (1) successive prosecutions; (2) multiple charges under separate statutes, and (3) multiple charges under the same statute for the same act.[250] Here, McGuiness contends that the second protection was violated. This argument requires us to apply the United States Supreme Court's *Blockburger* test.

In *Blockburger v. U.S.*, the Supreme Court held that "where [an] act . . . constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each [statutory] provision requires proof of a fact which the other does not."[251] As we recently explained in *White v. State*,

> Where the charges derive from two different statutes "the question is whether, both sections being violated by the same act, the accused committed two offenses or only one" for which the inquiry is "whether each provision requires proof of a fact which the other does not." This is a principle of statutory construction that derives from the underlying assumption that the legislature does not intend to punish the same offense under two different statutes. However, that rule of construction "gives way in the face of clear legislative intent to the contrary." This test is codified in Delaware statute at 11 *Del. C.* § 206, and is satisfied

---

[248] *White v. State*, 243 A.3d 381, 396 (Del. 2020).

[249] *Mills v. State*, 201 A.3d 1163, 1169 (Del. 2019).

[250] *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Nance v. State*, 903 A.2d 283, 286 (Del. 2006).

[251] *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

where an inquiry into the statutes demonstrates "each requires proof of at least one element that is not required to prove the others."[252]

McGuiness rests her argument that Counts I and IV violated the multiplicity doctrine on the jury instructions in this case. Specifically, she relies on the Superior Court's instruction to the jury that, to find McGuiness guilty of Official Misconduct for Count IV, it must unanimously find that she engaged in the conduct forming the basis for Counts I or III.[253] McGuiness contends that because a conviction of Count IV required proof of either Count I or Count III, plus proof that McGuiness "intended to obtain a personal benefit," Counts I and III were included in Count IV and neither Count I nor Count III "required proof of a fact" that Count IV did not.[254]

This argument misapplies the multiplicity doctrine because it relies on the jury instructions rather than the statutes themselves. As *White* and our other cases demonstrate, application of this part of the multiplicity doctrine is "a question of statutory construction,"[255] and that statutory inquiry does not support McGuiness's position. Count I charged McGuiness with Conflict of Interest under 29 *Del. C.* § 5805. Section 5805 required the State to prove McGuiness: (i) was a State employee, officer, or honorary official; (ii) participated on the State's behalf in the review or

---

[252] *White*, 243 A.3d at 397–98 (internal citations omitted).

[253] App. to Opening Br. at A1082–83 (Jury Instructions).

[254] Opening Br. at 48 (quoting *White*, 243 A.3d at 397).

[255] *White*, 243 A.3d at n.67. *See also Missouri v. Hunter*, 459 U.S. 359, 368–69 (1983); *Nance*, 903 A.2d at 286; *Poteat v. State*, 840 A.2d 599, 603–04 (Del. 2003).

disposition of a matter pending before the State in which she had a personal or private interest; and (iii) the personal or private interest was one that tended to impair her independent judgment in the performance of her duties, meaning that any action or inaction with respect to the matter would cause a financial benefit or detriment to accrue to McGuiness or her close relative to a greater extent than that benefit or detriment would accrue to others in the same class or group of persons.[256]

Count IV charged McGuiness with Official Misconduct under 11 *Del. C.* § 1211, which provides:

(a) A public servant is guilty of official misconduct when, intending to obtain a personal benefit or to cause harm to another person, the public servant knowingly does any of the following:

(1) Commits an act constituting an unauthorized exercise of official functions, knowing that the act is unauthorized.

\* \* \*

(3) Performs official functions in a way intended to benefit the public servant's own property or financial interests under circumstances in which the public servant's actions would not have been reasonably justified in consideration of the factors which ought to have been taken into account in performing official functions.

A comparison of these statutes shows that Conflict of Interest contains an element absent from Official Misconduct, namely, whether the matter at issue would cause an inequivalent benefit or detriment to accrue to McGuiness or a close relative.

---

[256] 29 *Del. C.* § 5805(a). The recitation of these statutory elements contains only the elements relating to the specific charge against McGuiness. The statute contains alternative elements that are not relevant in this case.

Likewise, Official Misconduct contains a unique element, specifically, whether McGuiness intended to obtain a personal benefit through performance of an official function. Although McGuiness seems to urge us to find multiplicity because the State alleged that the same act violated both statutes, that is not the inquiry. The only question before us is "whether the statutory elements of one offense necessarily satisfy the other, not whether, in a specific case, a single act completed both offenses."[257] Because each statute at issue requires "proof of facts not necessary to complete the other," they can "support separate convictions and punishments without offending the Double Jeopardy Clauses."[258]

## F. The trial court's comment regarding Robinson's testimony

McGuiness next contends that the trial court violated the Delaware Constitution by commenting on Robinson's testimony. Article IV, Section 19 of the Delaware Constitution prohibits judges in jury trials from commenting on the weight or credibility of the evidence.[259] Because this is a constitutional claim, we review the trial court's comments *de novo*.[260]

This appeal point arises from questions McGuiness's counsel posed to Robinson when he was re-called to the witness stand during the defense's case.

---

[257] *White*, 243 A.3d at 399 (citing *Blockburger*, 284 U.S. at 304).

[258] *White*, 243 A.3d at 399 (emphasis omitted).

[259] *Wright v. State*, 405 A.2d 685, 689 (Del. 1979).

[260] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).

Counsel questioned Robinson about calls he made to OAOA employees in May and June 2021 and whether he told those employees that he was contacting people "throughout state government" regarding casual-seasonal employment during the pandemic.[261] Robinson conceded that these statements were inaccurate in the sense that he only contacted OAOA employees, but he refused to agree with McGuiness's counsel that his statements were "false."[262] In sustaining the State's objection that counsel's questions were "asked and answered," the trial court remarked in the jury's presence:

> THE COURT: If you want to pursue this, we all know what it is. It's an investigative technique used by the officer. You want to ask him that, that's fine. But to imply that because this is false, he is lying. That's simply unfair, Mr. Wood. So you can ask him about investigative techniques if you like. But to imply otherwise is not acceptable.[263]

The trial court then instructed McGuiness's counsel to "Move on."[264]

The State argues that the court was not commenting on the evidence but only exercising its discretion to control the mode and order of witness interrogation.[265] But the rules of evidence do not diminish constitutional principles, and the Delaware Constitution's prohibition against judges commenting on evidence extends to any

---

[261] App. to Opening Br. at A4889–93 (Trial Tr.).

[262] *Id*. at A4890–92 (Trial Tr.).

[263] *Id*. at A4892 (Trial Tr.).

[264] *Id*. at A4893 (Trial Tr.).

[265] D.R.E. 611.

comment made by the judge that directly or indirectly conveys the court's estimation of the truth, falsity, or weight of a witness's testimony.[266] In commenting on Robinson's testimony and counsel's characterizations of it, the trial court at least indirectly conveyed its view regarding the truth and weight of Robinson's testimony. If the trial court believed McGuiness's counsel was badgering the witness by unfairly characterizing his investigative technique, the judge should have raised that concern outside the jury's presence.

We conclude, however, that this single comment was harmless error. When an error relates to a constitutional right, we must determine if it was harmless beyond a reasonable doubt.[267] In applying that test, we weigh the "significance of the error against the strength of the untainted evidence of guilt to determine whether the error may have affected the judgment."[268] Here, the testimony at issue related to a minor point regarding information provided to OAOA employees during investigatory calls. McGuiness was permitted to present evidence and thoroughly cross-examine the State's witnesses regarding the DOJ's good faith and accuracy in conducting its investigation. The trial court also instructed the jury that they were the "sole judges of the credibility of each witness," they should not view any of the trial judge's

---

[266] Randy J. Holland, *The Delaware Constitution: A Reference Guide* 149–51 (2002).

[267] *Williams v. State*, 141 A.3d 1019, 1035 (Del. 2016).

[268] *Id.*

evidentiary rulings as a sign of favoritism toward one side, and nothing the judge said during the course of the trial should be viewed as expressing an opinion about the case's outcome.[269]  Given that record, we are confident that the trial court's isolated comment about Robinson's testimony was not significant to the jury's judgment.[270]

## G. McGuiness's request for appointment of private counsel at State expense

Finally, McGuiness argues that the trial court misinterpreted 10 *Del. C.* § 3925 and thereby erred in denying her request for the State to pay the costs for private counsel.[271]  It is undisputed that McGuiness chose to forgo seeking representation from ODS or OCC.  She asserts that because of her "distrust of other state agencies due to the nature of her case" she was "forced [] to hire her own private counsel for trial."[272]  McGuiness now asks this Court to "vacate the trial court's October 28, 2021[] Order and order a hearing on remand to determine the extent of McGuiness's expenditures in hiring private counsel and order reimbursement by the State for those expenses."[273]

---

[269] App. to Opening Br. at A1092, A1097, A1100 (Jury Instructions).

[270] *See Wright*, 405 A.2d at 690 (noting that the comments and remarks of the trial judge, standing alone, may not have constituted error).

[271] Opening Br. at 53.

[272] *Id*. at 58.

[273] *Id*.

This Court reviews issues of statutory construction *de novo*.[274]  But, when a

statute gives the trial court discretion, this Court reviews the application of that

discretion to determine whether the court exceeded the bounds of reason in light of

the circumstances, or so ignored recognized rules of law or practice [] as to produce

injustice.[275]

Section 3925 gives the trial court discretion to appoint private counsel in

certain circumstances.  It provides:

> Any public officer or employee, in a criminal or civil action against the
> person arising from state employment, shall be entitled to petition the
> court for a court-appointed attorney to represent the person's interests
> in the matter. If the judge, after consideration of the petition,
> examination of the petitioner and receipt of such further evidence as the
> judge may require, determines that the petition has merit, the judge shall
> appoint an attorney to represent the interests of such public officer or
> employee. The court-appointed attorney shall represent such person at
> all stages, trial and appellate, until the final determination of the matter,
> unless the attorney is earlier released by such person or by the court.
> The court may first appoint an attorney from the Department of
> Justice. *If the court determines that the Department is unable to
> represent such public officer or employee, the court may appoint an
> attorney from the Office of Defense Services in criminal actions*

---

[274]*State v. Barnes*, 116 A.3d 883, 888 (Del. 2015) ("We review issues of statutory construction *de novo*."); *Zhurbin v. State*, 104 A.3d 108, 110 (Del. 2014) ("[W]e review legal rulings, including the interpretation of statutes, *de novo*."); *Wilson v. Sico*, 713 A.2d 923, 924 (Del. 1998) (explaining that when a claim on appeal involves a trial court's statutory interpretation, it is reviewed *de novo* to determine if the trial court erred as a matter of law in formulating or applying legal precepts).

[275] *See Giuricich v. Emtrol Corp.*, 449 A.2d 232, 240 (Del. 1982) (applying abuse of discretion standard); *Pitts v. White*, 109 A.2d 786, 788 (Del. 1954) (explaining the abuse of discretion standard in the context of application of a statute by a trial judge).

*only,* and in civil actions may appoint an attorney licensed in this State. This section shall also apply to all federal courts within this State.[276]

Section 3925 states that the trial court "may" appoint an attorney from ODS if the DOJ is unable to serve as counsel. Although the appointment of counsel from ODS is discretionary, it does not follow that the trial court may overlook the statute's clear legislative mandate or apply an incorrect legal standard. To do so would be to abuse its discretion.[277]

Here, McGuiness has not demonstrated that the trial court incorrectly applied the statute. McGuiness asserts that the trial court "concluded that . . . [Section] 3925 barred appointment of private counsel at public expense."[278] This was not the trial court's holding. The trial court agreed with McGuiness "that the DOJ is unable to represent [her]," but the court found that "ODS *is* able to represent her."[279] The trial court therefore declined to appoint private counsel. McGuiness chose to forgo ODS representation in favor of proceeding with private counsel. Although she vaguely cites on appeal a generalized distrust of State agencies, she did not articulate to the trial court any reason why ODS or an OCC conflict attorney could not represent her.

---

[276] 10 *Del. C.* § 3925 (emphasis added). As the trial court correctly explained, the statute provides a simple process whereby "[a] public officer charged with conduct arising from her State employment is entitled to a defense provided by the [DOJ]. If the DOJ is unable to represent the public officer, the [ODS] is the public officer's court-appointed alternative." *McGuiness*, 2021 WL 5013826, at *2 (Del. Super. Oct. 28, 2021).

[277] *Giuricich*, 449 A.2d at 240 (applying abuse of discretion standard).

[278] Opening Br. at 55.

[279] *McGuiness*, 2021 WL 5013826, at *2 (Del. Super. Oct. 28, 2021).

As such, we hold that it was not an abuse of discretion for the court to deny McGuiness's petition for appointment of private counsel at State expense.

## CONCLUSION

For the foregoing reasons, we AFFIRM McGuiness's conviction as to Count I, REVERSE her conviction as to Count IV, and REMAND this matter to the Superior Court for further proceedings consistent with this opinion. Jurisdiction is not retained.

**SEITZ, Chief Justice, concurring in part and dissenting in part:**

I concur in the persuasive opinion of my colleagues in the Majority on all but one issue – that McGuiness's conviction for Count IV should be reversed and a new trial ordered because of "prejudicial spillover." According to the Majority, evidence relevant to Count III prejudicially spilled over into McGuiness's conviction for Count IV after the Superior Court dismissed Count III after trial. I disagree for the following reasons.

First, McGuiness did not make the Count III/Count IV "prejudicial spillover" argument before the Superior Court. The Superior Court did not plainly err when it dismissed Count III and found that evidence relevant to Count III could support a conviction under Count IV.

Second, the Majority relies on *United States v. Wright*, where the United States Court of Appeals for the Third Circuit employed a "prejudicial spillover" test. To find prejudicial spillover under *Wright*, evidence relevant to Count III could not be used to support a conviction under Count IV. The Superior Court found to the contrary. We should defer to its assessment.

And finally, there was no prejudice to McGuiness from dismissing Count III after trial. I respectfully dissent.

# I.

Appellate review starts by asking two questions – do we have jurisdiction, and if so, what is our standard of review? In this case, McGuiness filed a timely appeal and we have jurisdiction to hear criminal appeals from the Superior Court.[1] For the second question, we give great deference to a jury's factual findings, we review the trial court's discretionary rulings to decide whether it exceeded its discretion, and we review its legal determinations *de novo*.[2] But under Supreme Court Rule 8, unless the interests of justice require otherwise, the appellant must first fairly raise the issue on appeal in the trial court. If the appellate issue has not been fairly raised below, the argument is forfeited, and we usually review for plain error.[3]

Plain error occurs only when the error is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[4] It is "limited to material defects which are apparent on the face of the record; which are basic,

---

[1] Del. Const. art. IV, § 4(1)(b).

[2] *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997) ("Under Delaware law, enormous deference is given to jury verdicts,"); *Zimmerman v. State*, 628 A.2d 62, 65 (Del. 1993) ("Under an abuse of discretion standard, this Court will disturb a discretionary ruling of the trial court only when the ruling is based upon unreasonable or capricious grounds."); *Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 294 A.3d 1062, 1071 (Del. 2023) ("This Court reviews questions of law *de novo*.").

[3] *Baker v. State*, 906 A.2d 139, 150 (Del. 2006) ("Where defense counsel fails to raise a timely and pertinent objection to alleged prosecutorial misconduct at trial and the trial judge does not intervene *sua sponte,* we review only for plain error.").

[4] *Smith v. Delaware State Univ.*, 47 A.3d 472, 479 (Del. 2012).

serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[5]

Plain error review is a high bar for important reasons. Trial court review gives the parties "a fair chance to address arguments at the trial court."[6] It is also "prudent for the development of the law that appellate courts have the benefits that come with a full record and input from learned trial judges."[7] In other words, "fair presentation facilitates the process by which the application of rights in an individual case affects others in other cases and society in general."[8] Here, McGuiness did not fairly raise the Count III/Count IV prejudicial spillover issue in the Superior Court.[9] In a criminal appeal where the appellant did not raise the issue below, the issue is forfeited and we review for plain error or for waiver.[10]

---

[5] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).
[6] *Shawe v. Elting*, 157 A.3d 152, 169 (Del. 2017).
[7] *Id.*
[8] *Id.*
[9] Under Supreme Court Rule 14(b)(vi) A (1), the appellant must make a "clear and exact" reference to the appendix pages where "a party preserved each question in the trial court." McGuiness does not cite to where the Count III/IV spillover argument was raised below. McGuiness cited A301-A371, which was McGuiness's Motion to Dismiss Count Three (which does not speak to spillover or Count IV) and Opening Brief at 43 ("McGuiness moved pursuant to Rule 29(a) for judgment of acquittal on Count Three based on the *same legal argument* raised in her motion to dismiss"). It would have been preferable if McGuiness acknowledged that the argument was being raised for the first time on appeal or point us to the exact place where the Count III/IV spillover issue was raised and considered by the Superior Court.
[10] *See, e.g., Shawe*, 157 A.3d at 168; *Czech v. State*, 945 A.2d 1088, 1097 (Del. 2008) ("Failure to raise a contemporaneous objection to allegedly prejudicial testimony constitutes a waiver of that issue on appeal, unless the error is plain. Counsel's failure to object to the admission of improper evidence does not bar plain error review unless the party consciously refrains from objecting as a tactical matter, in which case the issue is waived and not reviewable."); *Crawley v. State*, 929 A.2d 783 (Del. 2007) ("The record shows that defense counsel made a tactical decision to use the drug

3

The Majority skips over Supreme Court Rule 8 and applies *de novo* review because they believe it would be unfair to apply plain error review in this instance. According to the Majority, McGuiness could not predict whether the Superior Court would accept her post-trial motion to dismiss Count III, and she should not have to argue the consequences that flow from a favorable result. But McGuiness sought to dismiss Count III before, during, and after trial and could have argued the consequences that flowed from dismissal. And she was aware of the *Wright* spillover argument. In her post-trial motion, McGuiness raised a prejudicial spillover argument under *Wright*, but based on evidence related to Count V, not Count III.[11] McGuiness's Count V *Wright* arguments in the Superior Court were similar to those in this appeal.

Finally, to employ *de novo* review, the Majority relies on *United States v. Fattah*, where the Third Circuit applied "plenary review over a *district court's* denial of a claim of prejudicial spillover[.]"[12] As the italicized words show, in *Fattah* the

related evidence in a way he believed to be to his client's advantage; that tactical decision constitutes a waiver and bars plain error review.").

[11] A1508-A1517 (McGuiness's post-trial motion); A1508 ("[T]estimony was therefore wholly irrelevant to the charged offenses as a matter of law, and therefore unfairly prejudicial"); A1509 ("The evidence was clearly irrelevant to the charged conduct, and thus constituted impermissible uncharged misconduct evidence."); A1514 ("[T]he admission of this uncharged misconduct evidence tainted the jury's consideration of Counts One, Three, and Four. Under the doctrine of "prejudicial spillover," evidence erroneously admitted in support of one charge can have a deleterious effect on a jury's consideration of other charges." *United States v. Fattah*, 914 F.3d 112, 186 (3d Cir. 2019). Prejudicial spillover is a widely recognized basis for a new trial. *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012), as amended (Feb. 7, 2012) (vacating judgment of conviction and remanding for new trial).").

[12] *United States v. Fattah*, 914 F.3d 112, 186 (3d Cir. 2019) (emphasis added).

Third Circuit reviewed the trial court's prejudicial spillover decision, which is not the case here. And regardless, a closer look at *Fattah* shows that *de novo* review is the incorrect standard of review when a prejudicial spillover argument is not raised in the trial court.

To decide the standard of review in *Fattah*, the Third Circuit relied on its decision in *United States v. Lee*.[13] In *Lee*, the appeals court confronted a situation like here where "the issue of taint was never raised before the District Court" because the jury acquitted the defendant of the charge.[14] After acquittal on one charge, the defendant argued on appeal that evidence relevant to the acquitted charge tainted his conviction on another charge. Like here, the defendant could not have known until after trial that he would be acquitted of the charge.

Addressing the standard of review as a matter of first impression, the Third Circuit set clear standards depending on whether the issue was first raised in the district court. If the appellant raised prejudicial spillover in the district court, the *Lee* court looked to "how we address challenges to the sufficiency of evidence as a guide."[15] In that situation, the standard of review is plenary and the court decides whether there was substantial evidence that, when viewed in the light most favorable

---

[13] *United States v. Lee*, 612 F.3d 170, 178 (3d Cir. 2010).
[14] *Id.*
[15] *Id.*

to the government, would allow a rational trier of fact to convict.[16] Even with a plenary standard of review, the court noted that the standard is still "highly deferential."[17] But when, like here, the issue was not raised below, the court held that it reviews for plain error.[18] Thus, like *Lee*, where the prejudicial spillover argument did not arise until after the jury verdict, the standard of review here is plain error.

## II.

McGuiness argues that, during trial, the jury was exposed to supposedly inadmissible and inflammatory evidence relevant to Count III that "spilled over" and prejudiced the jury's consideration of Count IV. As a matter of first impression, the Majority adopts a test from *Wright v. United States* to assess the prejudicial spillover issue.

In *Wright*, the government charged the defendants with honest services fraud, "traditional" mail fraud, and conspiracy. The judge instructed the jury that the defendants could be convicted for honest services fraud under either a "conflict of interest" theory or a "bribery" theory.[19] On appeal from the convictions, the Third Circuit ruled that an honest services fraud jury instruction that included the conflict-

---

[16] *Id.* (quoting *United States v. Bornman*, 559 F.2d 150, 152 (3d Circ. 2009)).
[17] *Id.*
[18] *Id.* at 179.
[19] *Wright*, 665 F.3d, at 567.

of-interest theory was flawed and not harmless error based on an intervening Supreme Court decision that excluded conflicts-of-interest from the definition of honest services fraud. Thus, the jury could have mistakenly inferred an intent from the conflict-of-interest evidence that would not support a bribery theory.

As a threshold matter, the *Wright* court found that evidence related to conflict of interest would have been inadmissible to support an honest services fraud conviction. After making this necessary determination, the court also found that the "trial environment . . . emphasized the conflict-of-interest theory" and the jury instructions contained "about eight times more words to the conflict-of-interest theory than they did to the bribery theory."[20] Also, prejudice existed with "scant" evidence relevant solely to the preserved fraud count and "most of [the] case's four-volume appendix" focused on evidence "essentially irrelevant to the" valid fraud theory.[21]

Applying the *Wright* prejudicial spillover test here, the Superior Court did not plainly err by failing to detect a "material defect" which was "apparent on the face of the record." As required by *Wright*, the threshold question is whether the State introduced evidence that would have been inadmissible if the trial was limited to the remaining valid count.[22] The Superior Court found that the Count III evidence

---

[20] *Id.* at 572.
[21] *Id.* at 575-77.
[22] *Id*. at 575.

7

would be admissible as to Count IV.[23]  We should defer to that finding and end the inquiry here.[24]

But the Majority continues on, stating that "even if we accepted the theoretical basis for the State's position that Count III evidence would have been independently admissible to prove Official Misconduct for Count IV, that is not the theory that the State presented at trial."[25]  The Majority believes it "unlikely that the trial court would have admitted much of the payment-structuring evidence in the absence of Count III," relying on the fact that the State "seemingly spent 90 percent of this trial on Count III" and "effectively treated Count III as a predicate offense for Count IV."[26]  But this has no bearing on the admissibility of evidence.

Under the first step of the *Wright* analysis, the question is whether the evidence would be admissible in a *hypothetical* trial that discarded Count III.[27]  By mixing a trial court's admissibility determination at a hypothetical trial with the State's conduct at the actual trial, the Majority misapplies the *Wright* test and fails

---

[23]*State v. McGuiness*, 2022 WL 3971195, at *6 n.51 (Del. Super. Ct. Aug. 30, 2022) ("While this Court has found the jury's verdict as to Count Three was not supported by the evidence, the facts surrounding the interaction between MyCG, Christie Gross and the Defendant can still be considered and are relevant to whether the facts support the Official Misconduct offense found in Count Four.  Count Three is a technical one relating specifically to the procurement process while Count Four is broader in scope and relates to the relationship between the Defendant, Daughter, and MyCG.").

[24] *Id.*

[25] Majority Opinion ("Op.") at 59, 60.

[26] *Id.* at 59, 58.

[27] *Wright*, 665 F.3d, at 575.

to defer to the Superior Court's express finding. And it is hard to reconcile with the Majority's acknowledgment that *Wright* "counsels against concluding that evidence would have been inadmissible when it is a close question."[28] The Superior Court did not err in concluding Count III was relevant to Count IV and "can still be considered" to "support the Official Misconduct offense[.]"[29]

Finally, even if the Court reached the prejudice prong of the *Wright* test, there was no prejudice here. As explained above, the State would have been allowed to introduce the same evidence relevant to Count III to convict under Count IV, even if the court dismissed Count III before trial. The Majority also agrees that sufficient distinct evidence could support McGuiness's conviction on Count IV.[30] In other words, "[e]ven if evidence related to Structuring had been excluded entirely, the jury received sufficient evidence to convict McGuiness of Conflict of Interest, which also supported the Official Misconduct charge."[31] Also, unlike *Wright*, each count charged a separate crime.[32] Here, the Superior Court instructed the jury to consider each count independently. The jury reached a discriminating verdict. We presume

---

[28] Majority Op. at 58.

[29] *State v. McGuiness*, 2022 WL 3971195, at *6 n.51 (Del. Super. Ct. Aug. 30, 2022).

[30] Majority Op. at 63.

[31] Id.

[32] *Wright*, 665 F.3d, at 576, 577.

that juries follow their instructions.[33]  The jury was not confused by the relationship between the counts.

Under *Wright*, the court must also consider the language employed by the State at trial.  But the analysis is incomplete without considering the language employed by *both* parties *throughout* the proceeding.  Given McGuiness's counsel's highly charged language,[34] McGuiness was not damaged "in ways that would not have occurred" but for Count III.[35]

The Superior Court did not plainly err when it found that the evidence relevant to Count III would support a conviction under Count IV.  I respectfully dissent from the reversal of McGuiness's conviction under Count IV.

---

[33] *United States v. Fattah*, 914 F.3d 112, 189 (3d Cir. 2019), *Guy v. State*, 913 A.2d 558, 566 (Del. 2006).  *See generally Phillips v. State*, 154 A.3d 1146, 1154 (Del. 2017) and *Revel v. State*, 956 A.2d 23, 27 (Del. 2008).

[34] A5008 ("[W]e tell you with reservation and maybe even a tinge of sadness that when the State tells you she's guilty, you simply cannot trust what they say because the evidence tells you something else."); A5012 ("[the State's] investigation was incompetent, incomplete, and biased."); A5006-A5007 ("the State's investigation and prosecution is not based on the truth, the whole truth, and nothing but the truth."); A5007 ("Folks, the evidence shows that the State's investigation in this case was incomplete, incompetent, and biased from the very beginning."); A5011-A5012 ("You simply can't trust the State."); A5032 ("If you're going to trust somebody in this investigation, you're going to trust a woman like Amy Gulli who doesn't live in Delaware and doesn't work for the auditor's office who you saw?  Or are you going to trust the State, who wraps itself in Thomas Van Horn who they know is a liar who perjured himself in front of a grand jury?"); A5049 ("This investigation was incompetent, incomplete, and biased from the very beginning.  This was not an investigation designed to ferret out the truth.  Early on the State decided Kathy McGuiness was guilty.  They made a conscious choice to ignore evidence that might show she wasn't guilty, and when they ran into that evidence anyway, they made a conscious choice to ignore it here in this trial.").

[35] The Majority cites *United States v. Cross*, 308 F.3d 308, 316 (3d Cr. 2002) but in *Cross*, like *Pelullo*, the defendant was estopped from contesting the characterizations at issue.  That is different from here, where McGuiness used similar inflammatory tactics throughout a contentious trial.

10